E. L. CHESTER COMPANY, Respondent, vs. WISCONSIN
POWER & LIGHT COMPANY, Appellant.

*March 11—April 11, 1933.*

For the appellant there were briefs by *Schubring, Ryan & Petersen* of Madison and *H. W. Adams* of Beloit, and oral argument by *Mr. William Ryan* and *Mr. Adams*.

For the respondent there was a brief by *Arnold & Johnston* and *Wolfe & Hart,* all of Beloit, and oral argument by *W. H. Arnold* and *H. O. Wolfe.*

The following opinion was filed April 11, 1933, following an order for a reargument upon certain stated questions:

OWEN, J.  On the morning of December 5, 1930, a gas main located on the south side of Grand avenue, just outside the sidewalk curb, in the city of Beloit, sprang a leak. This was discovered at about 4:45 a. m.  A policeman patroling the beat noticed no gas at that point at 4 o'clock. At about 6:04 a. m. there was a terrific explosion in a store known as the Anderson jewelry store, located immediately across the sidewalk from the point of the leak.  The store was wrecked, the front end lying out on the sidewalk. "There was a great big opening where there used to be a building."  A section of the roof was blown 150 feet from the building, and an iron beam weighing 1,280 pounds was thrown out into the street clear of the sidewalk.  Fire re-

sulted from the explosion, destroying the Anderson jewelry store, which was owned by the plaintiff, as well as three other stores to the west, two of which were owned and occupied, and the other occupied, by the plaintiff, all in conjunction as a retail mercantile store. In addition, two stores to the east of the Anderson jewelry store were also consumed by the fire.

The leak in the gas main was the result of a defective valve therein located at the bottom of a manhole. Between the time of the discovery of the leak and the explosion the atmosphere about this manhole was strongly charged with gas. One of the employees of the company who was summoned to the scene declared that there was enough gas escaping there to "blow up the town." He did not dare to attempt to remove the manhole cover for fear that the friction resulting from such an attempt would ignite the gas.

Approximately three and one-half feet from the manhole a concrete boulevard light post was set solidly in the concrete street sidewalk. This post was of solid concrete, except for a two-inch hollow through its center, extending from a point in the sidewalk to its top, which hollow was provided for the accommodation of the electric cables. The fixture upon the top of this post was demolished by the explosion, and, immediately following, a flaming gas jet spurted from the top of the post. An employee of the defendant stated, during the excitement following the explosion, that the boulevard light set off the gas. This circumstance indicates that the escaping gas permeated the soil adjacent to the manhole.

The distance from the gas main to the outside foundation wall of the Anderson store was the distance across the sidewalk, approximately twenty feet. There was no proof of any kind that there was any other explosive in the store or in that vicinity.

The jury found that the explosion resulted from a leakage of gas from a broken valve in defendant's gas main which

entered the Anderson store. The appellant challenges the sufficiency of the evidence to sustain this finding.

It is pointed out that there is an entire lack of evidence to show that the leaking gas penetrated the earth under the sidewalk to the Anderson store, that the burden rested upon the plaintiff to prove definitely the source and cause of the explosion, and that, under all the circumstances, the jury could but guess or conjecture that the explosion resulted from the leaking gas.

The rule, thoroughly established and recognized, to the effect that where the evidence discloses that the proximate cause of an accident may as well be attributed to a non-actionable as to an actionable cause, the jury will not be permitted to guess or conjecture as to the cause of the accident, is invoked, to which proposition *Hyer v. Janesville,* 101 Wis. 371, 77 N. W. 729; *Quass v. Milwaukee G. L. Co.* 168 Wis. 575, 170 N. W. 942; *Rost v. Roberts,* 180 Wis. 207, 192 N. W. 38; *Ennis v. Milwaukee E. R. & L. Co.* 202 Wis. 277, 232 N. W. 540, and many other cases, are cited and relied upon. This rule has no application here, because there is an absolute lack of evidence that the explosion could have resulted from any other cause. The evidence shows an explosion, a leaking gas main which surcharged the atmosphere and entered the soil in that vicinity with gas, and affords no reason whatever to suppose that the explosion resulted from any other explosive material. We think it was not only a permissible but a very natural inference that the explosion in question resulted from the escaping gas from the broken gas valve in the defendant's gas main, and that the finding of the jury to this effect cannot be disturbed in the absence of other evidence in the case showing that such a result was physically or scientifically impossible.

Defendant introduced much expert testimony to show that the explosion within the store could not have resulted from the escaping gas. One line of such testimony tended to show

that it was impossible for the gas to penetrate the soil under the sidewalk during the time intervening between the occurrence of the leak and the time of the explosion. This conclusion of the experts was based upon the assumption that the earth below the sidewalk was of a solid and stable character, and of one of either of two assumed compositions. According to this testimony it would require from six to nineteen hours for the gas to penetrate the intervening distance between the point of the leak and the outside wall of the Anderson store building. However, other testimony in the case showed that the earth beneath the sidewalk was not solid in character, but that it was characterized by fissures, chasms, and voids, which would afford no opposition whatever to the penetration of the gas.

In the light of such evidence, the expert testimony upon which defendant relies was not of a character rendering it impossible for the jury to find that the escaping gas did find its way into the Anderson building within the time intervening between the happening of the leak and the explosion.

Another line of expert testimony relied upon by the defendant is to the effect that the character of the explosion indicates that it was not a gas explosion, but was the result of an explosion of a much higher explosive quality. While defendant's expert testimony was to the effect that the damage resulting from this explosion could not have been accomplished by a mere gaseous explosion, this testimony was met by other expert testimony on behalf of the plaintiff to the effect that the resulting damage was well within the power of a gaseous explosion. Upon this issue, therefore, a plain jury question was presented. It was within the province of the jury to determine whether the conclusions of plaintiff's or defendant's experts were correct.

The testimony in the case is very voluminous, and this opinion could be greatly extended if an attempt were made to review every detail thereof. Suffice it to say that appel-

lant's contentions in this respect have been thoroughly considered and weighed, the main outlines of which have been stated, and our conclusion is that a court would be wholly unjustified in disturbing this finding of the jury. A review of the evidence shows an abundance of support for the conclusion that this explosion resulted from the only explosive substance known to be in that vicinity, and that, under the circumstances of the proof in the case, to set aside this finding would be rather shocking to common sense.

We proceed with the further consideration of the case, therefore, upon the assumption that the explosion and the resulting fire were occasioned by gas escaping from defendant's gas mains due to a broken valve.

One, and perhaps the principal, question of negligence relied upon to recover was the improper construction of the gas mains. The system of construction of the gas mains was of the type known as the "rigid system." A ditch was dug and a steel pipe was placed in the ditch consisting of about forty-foot lengths. These lengths were welded in the ditch. They were placed upon wooden blocks put under the pipe, and dirt was tamped in solid underneath the pipe with shovels. The main followed the contour of the street. Where a curve occurred in the street, the pipes were consolidated; possibly the pipe was cut on the bias and then welded. At stated distances valves were inserted in the main, which valves were located in manholes. There were no so-called "absorption joints" located anywhere in the system. The safety of the system depended entirely upon its tensile strength to protect it from temperature and local stress tension.

The testimony of the defendant was to the effect that this was a method of construction adopted by all gas companies constructing plants in climatic conditions similar to those at Beloit.

There was testimony that up to 1916 the ordinary construction of gas plants included an "absorption joint" in close proximity to a valve to absorb the tension resulting from either climatic conditions or local stress, but that since 1916 the installation of such valves had been eliminated by all gas companies for the reason that their presence resulted in underground gas leakage.

This is believed to be a fairly accurate summary of the defendant's testimony with reference to the proper method of construction.

However, plaintiff introduced testimony, notably that of one Robert Cramer, who testified to vast experience as a consulting engineer, having been chief engineer of the Sewer Commission of the city of Milwaukee from May, 1927, to January 1, 1931, and having had broad experience with the construction of underground pipe lines. But he had had no experience with the construction of gas pipe lines. He testified that safe construction of any sort of underground pipe line required the installation of an absorption joint or dresser sleeve in close proximity to any valve such as the valves that were inserted in this gas pipe line; that in any underground pipe line there were bound to be terrific local stresses or tensions apart from those resulting from the change of temperature, and that the valves could not be made of sufficient strength to withstand such stresses unless they were relieved by absorption joints or dresser sleeves in their close proximity on one side or the other of the valve.

If this testimony was admissible it made a jury question as to whether or not proper construction required the installation of these joints or sleeves.

It is contended by the defendant that in view of the fact that Cramer had no experience with gas pipe lines he was not qualified to testify as an expert. It plainly appeared that he had had vast experience in the laying of underground

pipe lines. It is quite obvious that no matter what is conveyed by or within these pipe lines, the stresses to which they are subjected by reason of temperature and local conditions must be the same. It is also quite obvious that an underground pipe line cannot be so securely set in the ground that it will not be subjected to stresses due to lateral strain. This was testified to by Mr. Cramer, and, while he expressed the opinion that the valve employed in this instance was sufficient to withstand strains resulting from temperature, he did give it as his opinion that the valve was not necessarily of sufficient strength to withstand lateral strains to which any kind of an underground pipe line was necessarily subjected.

In *Seitz v. Zukowski*, 194 Wis. 78, 215 N. W. 939, an expert witness was permitted to testify to the defective construction of a mausoleum, although he had never had any experience in the construction of mausoleums. The court said:

"We are unable to perceive how the problems connected with the building of the walls of a mausoleum differ from those encountered in the erection of any similar structure used for other purposes so as to disqualify the witnesses who had large experience in the construction of similar walls in other buildings."

We think the witness Cramer was undoubtedly competent to testify to what constituted proper construction of an underground gas pipe line, although he had not in fact had any experience with the construction of gas pipe lines. His vast experience with reference to the construction of underground pipe lines in general, which gave him familiarity with the stresses and strains to which such lines are subjected, qualified him to testify as an expert upon the question of whether an absorption joint or sleeve valve in close proximity to a valve such as this, was an essential of safety. Nor do we think his testimony can be excluded because in some instances he did not testify to purely hypothetical ques-

tions.  That experts are not restricted to testifying upon a hypothetical state of facts is indicated by the testimony of physicians permitted in negligence cases to the effect that the patient's condition is the result of the accident.  *Sullivan v. Minneapolis, St. P. & S. S. M. R. Co.* 167 Wis. 518, 167 N. W. 311, and cases there cited.

Our conclusion, therefore, is that the testimony of Cramer was competent and raised a jury question as to whether safe and proper construction required the installation of a sleeve valve, the absence of which caused the break and leak. ·

In this connection the defendant strenuously relies upon the principle that if the defendant built its gas mains in accordance with plans adopted and followed by other gas companies in climatic conditions similar to those obtaining in Beloit, it fulfilled its full duty, and that it cannot be convicted of negligence in construction.  In support of this contention great reliance is placed upon the case of *State Journal Printing Co. v. Madison,* 148 Wis. 396, 134 N. W. 909. The principle of that case comes perilously near adopting the proposition that one who embarks upon a dangerous undertaking may escape liability therefor if he delegates the performance of such undertaking to another person, a proposition which is repudiated by this and all other courts.   We are not disposed to extend the principle of that case.

There is much law to the general proposition that where the conduct of a defendant coincides with the customary method of doing the same business by others, under similar circumstances, the inference of negligence is excluded.  This doctrine will be found cogently stated in *Bandekow v. Chicago, B. & Q. R. Co.* 136 Wis. 341, 117 N. W. 812.  This and other cases upon this subject were reviewed by this court in *Marsh Wood Products Co. v. Babcock & Wilcox Co.* 207 Wis. 209, 240 N. W. 392, where it was held that the testimony of a single witness to the effect that a certain steel ingot entering into the construction of a steam boiler was not properly inspected, although it was inspected in exactly

the same manner usually employed by all manufacturers, and in the manner required by the Rules of the American Society of Mechanical Engineers and the Rules of the Industrial Commission, raised a jury issue as to whether or not the ingot was properly inspected and tested. This case goes far towards rejecting the theory of the *Bandekow Case*. This question is the subject of a note found in 68 A. L. R. 1400, in which the author says:

"As an original proposition, it might be difficult to dissent from the principle stated by Mr. Justice HOLMES in *Texas & P. R. Co. v. Behymer,* 189 U. S. 468, 23 Sup. Ct. 622: 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' "

It seems to us that the language of Mr. Justice HOLMES above quoted must state the true rule. Anything which those engaged in the same line of business generally do, may be accepted as that which ought to be done, but if it excludes the necessity of doing anything else in order to meet the test of due care, it rests with a given industry to fix its own standards of care. What constitutes due care is under ordinary circumstances a question for a jury, and we have no doubt that the evidence here bearing upon the question of whether a sleeve valve should have been installed in close proximity to the valve in question presented an issue for the determination of the jury.

We have now dealt with the main questions which bear upon the right of the plaintiff to recover, and we arrive at the conclusion that upon those questions the defendant was not entitled to a nonsuit or a directed verdict in its favor.

Many minor questions claimed as error are pressed upon our attention, some of which we will now notice.

The first question of the special verdict was, "Did the fire which destroyed the plaintiff's property on the morning

of December 5, 1930, result from a gas explosion which occurred shortly preceding the fire?" The jury answered this "Yes." The form of this question is objected to because the question assumed that the explosion causing the fire was a gas explosion. One of the questions litigated was, What caused the explosion? The plaintiff claimed it was a gas explosion. This was controverted by the defendant. This was one of the principal issues to be determined. If determined in favor of the defendant it ended the case. It was necessary for the court to submit to the jury in some form a question which would enable the jury to say whether the fire resulted from a gas or some other kind of an explosion. We do not see that the form in which the question was worded revealed to the jury any idea that might have been entertained by the trial judge as to what caused the explosion. We think the objection to this question is trivial and unsubstantial.

Question 3 of the special verdict was as follows:

"Was the type of gas main construction known as the rigid system and consisting principally of steel pipe with welded joints and semi-steel cast valves, wherever valves are used, one of the approved types of construction commonly used by gas distribution companies in territory subject to similar weather conditions to those existing in Beloit?"

This question was answered "Yes" by the court.

Question 4 was as follows:

"Was the defendant's gas main on the west side of Grand avenue bridge, westward to the railroad track, properly constructed and equipped with such safety devices, if any, as were customary so as to comply with the requirements of such rigid type or system of construction?"

The jury answered this question "No."

It is claimed that these two questions and answers are inconsistent. This contention, however, is based entirely

upon the defendant's theory of what constitutes a rigid construction system. According to the defendant's contention, a rigid construction system did not include any safety devices such as sleeveless valves. It is agreed on all hands that the system of construction was the rigid construction system. There was a dispute as to whether the rigid construction system included the installation of safety devices in the nature of sleeveless valves. The court was therefore correct in answering the third question "Yes," because no one disputed that the system employed was the rigid system. The dispute was as to whether it was properly constructed; that is, whether it included the safety devices which should be included in the rigid system. Although it was a jury question, that issue was not properly submitted to the jury by question 4. The issue was not what was customary but did the defendant exercise ordinary care in construction and equipment with safety devices of. its system. Customary practice is not ordinary care; it is evidence of it.

The verdict is further criticized because it does not correctly submit the question of proximate cause. So far as the earlier questions of the verdict are concerned, they really have no relation to the liability of the defendant. They are simply for the purpose of determining certain preliminarily disputed questions, such as whether the explosion was a gas explosion, and whether, if it was a gas explosion, the gas came from a leak in defendant's main. So far as the first question is concerned, at least, that has no reference whatever to the liability of the defendant, and there is no occasion for tracing the proximate cause of the fire to that question. Question 4 of the special verdict is the first question which pretends to, or has anything to do with, proximate cause. Questions 5 and 6 are as follows:

"5. If you answer question 4 by 'No,' then answer this: Was such failure on the part of the defendant company to construct and equip the gas main in question so as to comply

with the requirements of said rigid type or system of construction a cause which brought about or contributed to bring about the breaking of the valve in question? Yes."

"6. If you answer question 5 in the affirmative then answer this: Ought the defendant company, in the exercise of ordinary prudence and intelligence in the operation of its gas-distribution business, reasonably to have foreseen that a break in some valve in the main might probably result by reason of its failure to comply fully with the requirements of said system of construction? Yes."

It is said that this verdict is framed after the pattern suggested in *Berrafato v. Exner,* 194 Wis. 149, 216 N. W. 165. The suggested questions in the *Berrafato Case* were intended to elicit all the elements necessary to constitute legal negligence, and this whether reasonable anticipation is considered an element of proximate cause or negligence. The first question suggested was designed to ascertain whether there had been a failure to use such care as the great mass of mankind ordinarily exercises in acting under the same or similar circumstances. Question 4 is not so framed as to elicit such information. Under the pattern of the *Berrafato Case,* the second question should inquire whether the damage was the natural and probable result of such want of ordinary care. Question 5 of the special verdict was intended to take the place of the suggested question No. 2 in the *Berrafato Case,* but that question, as embodied in this verdict, is, "Was such failure on the part of the defendant company to construct and equip the gas main in question so as to comply with the requirements of said rigid type or system of construction a cause which brought about or contributed to bring about the breaking of the valve in question?" The term "cause," which the pattern suggested in the *Berrafato Case* was intended to eliminate, was thereby introduced into the verdict. In connection with question 5 the court makes no attempt to define "cause." In connection with another question the court does attempt to define cause

as "anything is a cause which either contributes to, or is one of a number of causes, or is the sole cause, it is always a cause." This does scarcely more than tell the jury that a cause is a cause.

In *Osborne v. Montgomery*, 203 Wis. 223, 234 N. W. 372, it was said: "The use of the objectionable term 'proximate cause' may be avoided by using the term 'legal cause' or 'cause,' or perhaps 'substantial factor,' if the proper meaning be attributed to whatever term is used." In the instant case the court made no attempt to impress upon the jury that the cause must be the efficient cause, nor is there any limitation as to however remote it might be. If the pattern suggested in the *Berrafato Case* were followed, the question should have been, "Was the damage the natural and probable result of the failure of the defendant to properly equip its gas main with safety devices?"

Question 6 of the verdict is designed to supply the information called for by question 3 of the pattern suggested in the *Berrafato Case*. In compliance with that pattern, question 6 should have been worded something like this: "Ought the defendant company, in the exercise of ordinary prudence and intelligence, reasonably to have foreseen that damages to the interests of another might probably result from the escape of gas through the soil onto adjacent premises, by reason of such failure." As submitted, question 6 simply inquires whether the defendant should reasonably have foreseen that a break in some part of the valve might probably result by reason of its failure to comply fully with the requirements of said system of construction. An affirmative answer to this question accomplishes absolutely nothing as far as establishing the liability of the company is concerned. In order for the company to be liable it should have foreseen not merely that the valve would break, but that damage to the interests of another might probably result from such failure.

It will be noticed that the question above suggested limits the anticipation of the defendant to the damage resulting from the seepage of gas through the soil onto the adjacent premises. Under ordinary circumstances the defendant is liable if it should have anticipated injury to others as a result of its lack of ordinary care, and, generally speaking, it is not necessary that it should anticipate the exact resulting damage. As a general rule, the anticipation of some injury, as distinguished from the precise injury, is all that is necessary. *Meyer v. Milwaukee E. R. & L. Co.* 116 Wis. 336, 93 N. W. 6; *Schmeckpepper v. Chicago & N. W. R. Co.* 116 Wis. 592, 93 N. W. 533; *Luebben v. Wisconsin T., L., H. & P. Co.* 154 Wis. 378, 141 N. W. 214; *Pennell v. Rumely P. Co.* 159 Wis. 195, 149 N. W. 769; *Schabow v. Wisconsin T., L., H. & P. Co.* 162 Wis. 175, 155 N. W. 951; *Osborne v. Montgomery,* 203 Wis. 223, 234 N. W. 372. However, it has been held that an injury may be of such an extraordinary and unusual nature that it may be said as a matter of law that it is not a proximate result of the negligent act. In *Fox v. Koehnig,* 190 Wis. 528, 209 N. W. 708, a horse which had escaped from its inclosure through the negligence of its owner dashed through the windshield of a car traveling on the highway. It was held that, although the owner was negligent in the maintenance of his fences, the act of the horse was so extraordinary and unusual that the damages resulting from his plunging through the windshield should not have been anticipated by the owner, that his negligence was not the proximate cause of the injury inflicted by the horse on the occupants of the car, and that liability did not exist. This was held as a matter of law. Other similar cases are *Huber v. La Crosse City R. Co.* 92 Wis. 636, 66 N. W. 708; *Hasbrouck v. Armour & Co.* 139 Wis. 357, 121 N. W. 157, and the same question is discussed in *Morey v. Lake Superior T. & T. Co.* 125 Wis. 148, 103 N. W. 271. In the instant case it can

be said as a matter of law that the defendant should have anticipated that injury of some nature to the rights of others would follow from the breaking of the valve and the resulting escape of gas. However, the damage here resulting was due to the seepage of gas through twenty feet of earth within a period of two hours or less. The testimony in this case leaves no doubt that this was a rather unusual and extraordinary result. While we are not disposed to say as a matter of law that the negligence of the defendant was not the proximate cause of the damages complained of because of the unusual and extraordinary character of the result, we think that the question should be so framed as to elicit the finding of the jury on that question. Lack of ordinary care on the part of the defendant should not be held to be the proximate cause of the damages here in question simply because it should have anticipated that some damages to the interests of others might result from its failure to exercise ordinary care. While it is true that in the vast majority of cases reasonable anticipation of some injury to the interests of others is all that is necessary to establish actionable negligence or proximate cause, there are cases in which reasonable anticipation should be limited to a particular type of injury, and this is one of them. We therefore conclude that while the facts proved, and found by the jury, constituted a lack of ordinary care, the verdict of the jury does not establish such lack of ordinary care as the proximate cause of the accident.

Other grounds of negligence relied upon by the plaintiff and found by the jury were, failure of the defendant to have more readily available a map or record showing the location of shut-off valves, in failing to shut off the gas pressure more promptly than was done, and in failing to more promptly remove the manhole cover. It is contended that these findings do not constitute a want of ordinary care on the part of the defendant, and that the verdict in this respect is not supported by the evidence. We cannot sus-

tain this contention, but when it comes to establishing these circumstances as the proximate cause of the damages, we find the same difficulty with the verdict that has been heretofore pointed out.

It seems unnecessary to dilate further upon this very important defect in the verdict, or to indulge in a discussion with reference to these matters constituting a want of ordinary care. Even though they do constitute a want of ordinary care, the verdict is not so framed as to establish them as the proximate cause of the damages.

Error is assigned upon the instruction of the court telling the jury that "the burden of proof on this (fifth) question, and on all the subsequent questions, with the exception of the last one relating to damages, the burden of proof that these questions should be answered by 'Yes,' also rests upon the plaintiff, and you should not answer it by 'Yes,' unless you are convinced by a preponderance of the evidence to a reasonable certainty that it should be so answered." It is claimed that the burden of proof was upon the plaintiff with reference to the question of damages as well as upon those questions referred to in the instruction. This is realized by attorney for respondent, who points out that all of the questions referred to in the instruction, except the question relating to damages, call for a Yes or No answer, that in this instruction the court was merely referring to the questions calling for such an answer, and that it excluded the question relating to damages simply because it did not call for a Yes or No answer. However, this is not very apparent from the instruction, and it certainly could not have been apparent to the jury. The appellant's criticism that the exclusion of the question relating to damages from this instruction with reference to the burden of proof left with the jury the implication at least that with reference to such damages plaintiff was not confronted with the burden of proof, is quite plausible. The instruction was unfortunate at best and should be avoided upon a retrial.

Numerous errors are laid upon the ruling of the court in the admission or rejection of evidence, some of which have already been discussed as incidental to other questions and require no further repetition. A few others will be noticed.

The court received evidence that, prior to the breaking of the valve in question, another similar valve located in another part of the system also broke. It is claimed that this was error. Respondent justifies the reception of this evidence because, upon his theory, the entire installation was improper and unsafe, and was bound to give way at the weak or weakest point in the circuit, and that the situation is identical with that of the drive-belt, which it was claimed was defective and had broken upon previous occasions, evidence as to which was held admissible in *Brossard v. Morgan Co.* 150 Wis. 1, 136 N. W. 181, and numerous other cases on the point are cited by respondent. We conclude that there was no error in the reception of this evidence under the circumstances and under the issue formed.

Appellant further contends that the damages are excessive with respect to two items: (a) the value of the fixtures, and (b) consequential damages. The fixtures were the accumulation of years of experience in the building up of this business. Some of them had been purchased years ago and some more recently. No doubt the older fixtures had no market value, while they did have a real value to the plaintiff. The plaintiff testified that they were worth to him $20,000, and that such would be a reasonable price for them in a sale of the business. This appears to be a recognized way of estimating damages with reference to property of this nature. Where there is no market value, or where the market value does not represent the real value, testimony is admitted to show what they are really worth in the business and what the owner would pay for them if he was buying the business but was not obliged to buy, and what one would take for them in

selling the business who was not obliged to sell. The jury fixed the value of these fixtures at $14,500. We think the evidence abundantly shows that they were worth that much to plaintiff's business.

Consequential damages were fixed at $6,500. Plaintiff was out of business for two months by reason of this fire. During this time he was put to expense in keeping the organization together. The expense incurred in this respect was $4,430. For the last three years the months of December and January had yielded an average profit of $3,555.61. It was at least out the money that it paid in keeping its organization together, and it was out the profits that it would have made. The two items amounted to $7,986. The jury allowed $6,500, which seems perfectly reasonable. We conclude that the assignments of error with respect to damages cannot be sustained.

We freely concede that we have not yielded to counsel for appellant, whose brief in the case is able and ample, in taking up and considering seriatim many of the interesting questions which he has raised. We believe, however, that we have thoroughly considered all of the questions so raised, and that their treatment in detail would yield no different result. We believe that we have sufficiently treated the case for the purposes of another trial, and, so far as may be necessary, indicated our impression of the case with respect to the merits thereof. This is a most substantial case, and will no doubt be an expensive case to retry. We reverse the judgment with much reluctance, but we feel that the manner in which the case has been submitted to the jury cannot be approved, for which reason a new trial must be ordered.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

WICKHEM, J., dissents.