ENDERS and another, Respondents, vs. SINCLAIR REFINING COMPANY, Appellant.

*November 5, 1935—February 4, 1936.*

For the appellant there was a brief by *Sutherland, Hughes & Sutherland* of Fond du Lac, and oral argument by *A. D. Sutherland.*

*J. E. O'Brien* of Fond du Lac, for the respondents.

The following opinion was filed December 3, 1935:

ROSENBERRY, C. J. The controversy between the parties can best be stated in connection with Exhibit 16, a copy of which is reproduced herewith:

The street running in a northwesterly direction is known as Main street. The figures upon the map show the various

elevations based on a bench mark designated fifty. Plaintiffs' well is adjacent to their hotel property in the acute angle formed by Main street and the east and west highway, and is distant six hundred seventy-five feet from the defendant's bulk-station plant. The surface of the soil at the plaintiffs' hotel is thirteen feet higher than the surface of the soil at the defendant's plant. The whole area is underlaid by a formation of limestone. Upon the surface of this limestone are irregularities, but in a general way it slopes to the south. The top of the limestone at plaintiffs' well is three feet higher than the top of the limestone at the bulk station. All of the wells in the area inclosed within the acute angle formed by the west side of Main street and the northerly side of the highway were found to be contaminated by petroleum products. None of the wells on the easterly side of Main street were so contaminated.

The plaintiffs attempted to establish the fact that the petroleum products found in their well were negligently permitted by the defendant to escape from storage tanks at its bulk station. The plaintiffs established, according to the finding of the trial court, that petroleum products in excess of two thousand five hundred gallons so escaped, this over a period of about three years commencing in January, 1930. The court further found that the defendant negligently permitted large quantities of gasoline and kerosene products—

"to escape from the said leaky and defective tanks onto and into the earth surrounding said tanks through which it passed and escaped into the crevices in the limestone rock which underlies the soil at and about said bulk plant, through which crevices and rock it entered the well streams and water streams which supplied water to the said well and water plant of plaintiffs, which said condition continued for a period of about two years until said defective tanks were repaired."

The defendant contends that there is no evidence to support this finding. From the testimony given in the case, it

appears that there are only two possible ways in which escaping petroleum products could find their way from the defendant's premises to the plaintiffs' well: (1) By percolation through the soil. The court apparently was of the view that the evidence was insufficient to sustain plaintiffs' claim in that regard and it will not be further considered. (2) The second way in which it might find its way into plaintiffs' well was by the petroleum products entering a crevice in the limestone rock and so finding its way through crevices in the limestone to the plaintiffs' well. There is no evidence in the case that there are any such crevices either upon defendant's premises or in plaintiffs' well. The defendant attempted to meet this situation by procuring the services of a skilled sanitary engineer, Mr. E. R. Jones, who conducted elaborate experiments for the purpose of determining whether or not the defendant caused the condition complained of by the plaintiffs. He dug upon the site of one of the old tanks a pit three feet wide, seven feet long, and eleven feet deep. This excavation was not extended to the limestone rock, but into the sand and gravel above it. This pit was kept filled with water treated with salt and colored with fluorescein for ten days, and during that time there was pumped from plaintiffs' well thirty thousand gallons of water. However, none of the treated and colored water which escaped from the pit was found in plaintiffs' well. The expert testimony showed that, in passing through the soil or rock on its way to the well, the water put in the pit would lose none of its salt content. It also appears that water colored with fluorescein will lose none of its color passing through soil or rock, and will retain its color for three or four years. The fact that none of the water treated with salt and fluorescein found its way from the defendant's plant to the plaintiffs' well through a crevice was considered by the experts quite conclusive proof that petroleum products did not find their way from the defendant's plant to the plaintiffs' well through a crevice.

The case is rested as if the burden was upon the defendant to show that gasoline which escaped upon its premises did not reach the plaintiffs' well. This reverses the burden of proof. So far as we are able to discover from a careful study of the record, there is not a single bit of evidence in the case which shows or tends to show that the petroleum products which escaped on defendant's premises found their way into plaintiffs' well. Under some circumstances plaintiff might establish his claim by a process of elimination. If there was no other place where petroleum products were kept or stored in or near the plaintiffs' premises, and it was established that after the escape of a large quantity of petroleum products upon the defendant's premises, plaintiffs' well was polluted, there might be an inference that the escaped petroleum products had found their way to plaintiffs' well from defendant's premises. However, on the west side of Main street there are various places where petroleum products are stored. A Mr. Baus kept a large storage tank of kerosene within thirty feet of the Enders' hotel. At the south side of the Enders' hotel is a large storage tank for fuel oil owned by Edward Enders within ten feet of the well. West and north of the hotel is a large septic tank into which sewage from the hotel sewerage system is discharged. This septic tank is approximately twenty-five feet from the Enders' well. A short distance west of the septic tank Mr. Enders stored kerosene and petroleum products for use in the hotel. Connected with the sewage tank is a dry well into which the affluent of the septic tank is discharged. This well is approximately twelve feet deep but does not reach the bed rock. South and west from plaintiffs' well is a storage tank for gasoline maintained by one Kraemer. This is about one hundred twenty feet from the Enders' well. All of the wells in the vicinity of these places are contaminated, whereas wells much nearer the defendant's bulk-station plant and no higher in elevation are not so con-

taminated. The surface of the ground at the cheese factory well is only six or seven feet higher than the ground at the defendant's bulk-station plant and about one hundred and twenty-five feet distant. A test hole was sunk at point A to a depth of eighteen feet nine inches but no contamination was found. A second test hole at point B was sunk but there was no contamination.

It is considered that the evidence in this case, instead of eliminating the possibility of contamination from other sources, is such as to establish quite satisfactorily the fact that pollution comes from other sources rather than from the defendant's bulk-station plant. The trial court apparently rejected the percolation theory, and rested the case entirely upon the proposition of a crevice which connected the two places. Whether or not there is such a crevice and whether or not it connects the two premises is purely a matter of speculation and conjecture. The only test that could be made was made and it tended to disprove rather than establish the plaintiffs' case. It cannot be said that plaintiffs have by a fair preponderance of the evidence established the fact upon which they rely for recovery in this case. The plaintiffs recognize the principle that proof which merely leaves the matter to be established in the realm of speculation and conjecture is not sufficient, and rely upon the case of *Pfister & Vogel L. Co. v. Industrial Comm.* 194 Wis. 131, 215 N. W. 815, to sustain their position in that regard. In that case it was said:

"It is often impossible to find the source from which a germ causing disease has come [in this case anthrax in humans, lumpy jaw in animals]. The germ leaves no trail that can be followed. Proof often does not pass beyond the stage of possibilities or probabilities, because no one can testify positively to the source from which the germ came, as can be done in the case of physical facts which may be observed, and concerning which witnesses can acquire positive knowledge. Under such circumstances the industrial commission or the court can base its findings upon a pre-

ponderance of probabilities or of the inferences that may be drawn from established facts."

It appeared in that case that anthrax was a rare disease; that the germ which causes it is found in hides; that the germ does not die with the animal; that plaintiff had been employed in dressing hides; that the germ could enter the human system by coming in contact with the workman's hands; that there was no other known source of infection with which the claimant came in contact and the finding was permitted to stand.

This case is ruled by *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 248 N. W. 140. In that case the claimant tried to prove that he contracted typhoid fever in the course of his employment by showing that he was away on his route more than he was at home. On that basis he claimed that he proved his case by a preponderance of probabilities. This court, commenting upon the proposition, said:

"Although . . . the industrial commission or the court can base its findings upon a preponderance of probabilities or of the inferences that may be drawn from established facts [citing cases], that cannot be done when the proof does not pass beyond the stage of mere possibilities. Preponderance of mere possibilities is, of course, not the equivalent of a preponderance of probabilities. Mere possibilities leave the solution of an issue of fact in the field of conjecture and speculation to such an extent as to afford no basis for inferences to a reasonable certainty, and in the absence of at least such inferences there is no sufficient basis for a finding of fact."

There is no evidence in the case from which it can be said that there is even a probability that a crevice in fact does connect the premises of the defendant with the plaintiffs' well. All that appears here is that over a three-year period more than two thousand five hundred gallons of petroleum products escaped on defendant's premises; that during that same period the water in plaintiffs' well was polluted

by petroleum products. From that it is argued that there must be some connection between plaintiffs' well and defendant's premises. There being no evidence to sustain a finding that it reached plaintiffs' well by percolation, there remained only the other alternative, the passage by way of a crevice. No one testified that there was a crevice. No one testified that plaintiffs' well was polluted with the material which escaped on defendant's premises. It was suggested, but there is no evidence of it, and therefore nothing to sustain the trial court's finding except a mere conjecture.

Plaintiffs make light of the test made to discover whether or not there was a crevice, and say that the eighteen square feet, which was the area of the excavation, compared with the three thousand six hundred square feet, the area of plaintiffs' premises, is only one to two hundred, and therefore the chance of discovering a crevice by the test was remote. In the first place the pit was where there was the greatest loss by leakage. If the petroleum products could find their way from that place to plaintiffs' well through a crevice there would be no reason why colored water could not find its way. In the second place, the pit that was dug did not reach bedrock, and water reaching sand and gravel would spread when it struck the rock, so that the actual area might be many times the area of the pit itself. In the third place, if the result was negative it in no way helped to establish the plaintiffs' case. The plaintiffs do not fail in this case because their proof is overthrown by that of the defendant, but because their evidence fails to establish the facts necessary for recovery from the defendant by a fair preponderance of the evidence.

Plaintiffs further urge that they have a right of recovery—
"unless it is shown that such products [from other storage places] had been permitted to escape and enter the ground and the streams of water therein."

The burden of showing that there was no other possible source of pollution was upon the plaintiffs. The defendant was not required to prove that pollution from other sources did enter plaintiffs' well, unless and until the plaintiffs showed there was no other possible source of pollution. That fact was not established by the evidence. The plaintiffs having failed to establish their case by a preponderance of the evidence, they cannot recover.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.

FOWLER, J. (*dissenting*). I am compelled to dissent from the decision of the court. This court has accepted the proposition that a finding can rest upon a preponderance of probabilities. *Vilter Mfg. Co. v. Industrial Comm.* 192 Wis. 362, 212 N. W. 641; *Pfister & Vogel L. Co. v. Industrial Comm.* 194 Wis. 131, 215 N. W. 815. In the instant case, to my mind, the preponderance of probabilities clearly is that the contamination of plaintiffs' well came from leakage from defendant's storage tanks. It manifestly came from leakage of petroleum products somewhere. All possible sources of leakage are shown by the evidence. To my mind, from none of them but the defendant's leaking tanks, and from all of them together but those tanks, is it probable or even possible that sufficient leakage occurred to have percolated the plaintiffs' well and the three other contaminated wells in its vicinity, one one hundred fifty feet and two others each about one hundred feet away from it. Therefore, it is most probable, it is reasonably certain, that the contamination came from plaintiff's leaking tanks. Upon no other hypothesis can the contamination be accounted for except that there is a reservoir of natural oil or a stratum of oil-bearing shale in the immediate vicinity, and it is a matter of common knowledge that no such depository of natural oil exists any-

where in the geological formations of this region. We must either conclude that the contamination of plaintiffs' well came from defendant's leaking tanks, or that his well is not contaminated because there is no possible source of contamination.

But the finding of the circuit judge need not rest wholly upon the above reasoning. A test hole was made twenty-five feet east of the test pit dug at defendant's tanks. There is a well one hundred twenty-five feet or thereabouts west and slightly south of it, and another well three hundred feet directly west of it. None of these contained any trace of contamination. A test hole about two hundred feet to the west and somewhat north of the test pit, which was practically in line between the test pit and the contaminated wells, showed contaminated soil at bedrock like that at bedrock in plaintiffs' well. The contamination first showed in plaintiffs' well after leaking in defendant's tanks had existed for some considerable time. It lessened on removal of the leaking tanks. It is true, as suggested in the opinion of the court, that there is no direct evidence of any fissure leading from defendant's tanks to plaintiffs' well. But that rock fissures exist in the limestone rock underlying the vicinity is proven by the testimony and undisputed, and is moreover a matter of common knowledge of intelligent people of the region. The testimony may not show it, but fissures can be seen wherever outcroppings of the strata of rock underlying the region appear, as the trial judge, resident of the region, doubtless knows and as every intelligent person of the region must know. This and the fact of contamination support the inference of a connecting fissure, and in connection with the above amply support the conclusion of ultimate fact that the contamination comes from the leaking tanks.

Much stress is laid in the opinion of the court upon the fact that the colored water put into the pit did not show up in plaintiffs' well. There are obvious reasons why it may

not have done so. Fissures in limestone rock fill with earth and disintegrated rock and progress through a fissure is by percolation rather than flowing. The quantity of water put into the pit may have been insufficient to saturate the intervening soil; or the time may have been insufficient for it to reach the well by percolation; or the coloring matter may have been wholly absorbed by the soil, and the percolating water entirely freed from it before it reached the well; or the coloring matter may have spread in all directions and have been wholly absorbed by the pad of sand and gravel overlying the bedrock and never have reached the fissure that feeds the well. To my mind the fact that the color did not show up in the well is wholly inconclusive.

To my mind it seems that to reject the finding of the trial judge is to reject a common-sense inference. The situation is like that in *E. L. Chester Co. v. Wisconsin Power & Light Co.* 211 Wis. 158, 247 N. W. 861. An explosion occurred in a building. A gas main broke in the street adjacent. The explosion was simultaneous with the escaping gas. There was testimony of learned experts that the leaking gas could not have penetrated the soil between the main and the building within the time that elapsed between the breaking of the main and the explosion. Learned experts also testified that had the explosion been an explosion from gas ignition the fall of the building walls would have been inward instead of outward, or *vice versa*. From this testimony the inference is plain that gas from the broken main did not cause the explosion. But to so find would have been contrary to common sense, and the finding of the jury was upheld. The finding of the trial judge should be upheld in this case for the same reason.

It is claimed by the appellant that the evidence does not support the award of damages, and that evidence was improperly received upon that issue. Under the decision of the court there is no need to consider these contentions. But

to me it seems plain that the judgment of the circuit court should be affirmed or a new trial ordered on the issue of damages.

The following memorandum was filed February 4, 1936:

PER CURIAM (*on motion for rehearing*). A considerable part of the plaintiffs' brief on motion for rehearing is devoted to a disparagement of the opinion of the court in this case. The opinion is criticized because as the result of a verbal error it contains a statement that there was a jury trial and verdict for the plaintiffs. It is apparent from the opinion itself that the court in its consideration of the case well understood that the trial was before the court without a jury. Before the motion for rehearing came to its attention the mistake had been discovered and corrected by the court on its own motion.

We have considered such contentions set out in the motion for rehearing as are pertinent to the question raised, and find no reason for departing from the decision heretofore rendered. Plaintiffs' brief on motion for rehearing contains many impertinent, disrespectful, abusive statements reflecting upon the court. These statements are of such a premeditated, insulting character that they cannot be permitted to pass without notice. Counsel for plaintiffs is an experienced lawyer, and his conduct cannot be excused on the ground of petulance or a failure to appreciate the implications of the language contained in his brief. The language is contemptuous, and counsel is subject to reprimand for his unlawyerlike conduct.

It is ordered that the motion for rehearing be denied, with $50 costs, and the brief of the plaintiffs on motion for rehearing is ordered stricken from the files of this court.