VILLAGE OF COBB and others, Appellants, v. PUBLIC SERVICE COMMISSION, Respondent.

*January 10—February 7, 1961.*

445

For the appellants there were briefs by *Roberts, Boardman, Suhr, Bjork & Curry,* and oral argument by *Henry A. Field, Jr.,* all of Madison.

For the respondent there was a brief and oral argument by *William E. Torkelson,* chief counsel.

For the Chicago & North Western Railway Company there was a brief by *Wickham, Borgelt, Skogstad & Powell,* and oral argument by *Roger S. Bessey,* all of Milwaukee.

DIETERICH, J. The first issue raised by appellants is that the commission failed to comply with the notice requirements

of sec. 192.56, Stats. In support thereof the following reasons are stated: (1) The application must be considered on the basis of the individual communities affected and not, as in the instant case, on a single application involving numerous communities; (2) every continued or adjourned hearing before the commission must be treated as a new case and the posting of a statutory notice in "five conspicuous places" should again be carried out; (3) the commission failed to post statutory notices at the central-agency communities, and (4) hearings should have been held near the affected communities and not compel witnesses, as in this case, to travel in excess of 75 miles.

We believe that these contentions are clearly out of harmony with the fundamental purposes of the statute and with the decisions of this court.

The provision of sec. 195.01 (10), Stats., "The commission may hold sessions at any place for the convenience of the parties," does not deprive the commission of exercising its discretion as to the time and place it may select to hold its hearings. In the instant case there was no need to have a separate hearing in each community affected. It necessarily follows that the notice was sufficient.

Sec. 192.56, Stats., requires notices by posting of the time and place of hearing in five conspicuous places in the town or village where it is sought either to abandon any station in any town or village, or to remove the depot therefrom, or to withdraw agency service therefrom.

Notice of the railroad's application and of hearings scheduled on the application were posted in the 100 proposed associate-station communities, and in four communities from which a complete removal of agency service was sought. No notice was posted at the 81 proposed central-station communities. The notice which was posted included only those hearings scheduled for Madison on May 26, 27, 28, and 29, 1958. These hearings were held as scheduled. On June 19, 1958, a letter was sent by the commission to the parties of

record with a notification of hearings at Fond du Lac, Green Bay, Rhinelander, Spooner, Eau Claire, Tomah, Platteville, and again at Madison. Hearings were held as scheduled. There was no posting of notice as to these hearings. On July 23, 1958, the commission mailed letters "To Whom it may Concern," including a notice of hearing in Madison on August 5, 1958. Hearing was held on that date and also on August 6, 1958. There was no posting of notice as to these hearings.

There were approximately 118 witnesses who appeared in opposition to the central-agency plan. These witnesses appeared from or in behalf of approximately 50 of the 100 proposed associate-station communities involved in the plan. Among the appearances were village of Cobb, village of Johnson Creek, village of Sharon, village of Dalton, village of Bonduel, city of Galesville, village of Almond, and village of Verona.

We are thus brought to some fundamental considerations governing the authority of the commission. The commission has broad powers and a wide extent of administrative discretion, with the exercise of which, upon evidence, and within its statutory limits, the courts do not interfere. The important and salutary functions of the commission to enforce public rights are not to be denied or impaired, but the commission, exercising a delegated regulatory authority which does not have the freedom of ownership, operates in a field limited by constitutional rights and legislative requirements. The legal standards governing the action of the commission in the subject under consideration necessitate a fair hearing as a fundamental requirement.

This court stated in *Borgnis v. Falk Co.* (1911), 147 Wis. 327, 363, 133 N. W. 209, which is applicable here:

". . . the commission is an administrative board merely. It is common knowledge that such boards are frequently given power to investigate and determine facts without notice to

the parties of each successive step in the proceedings. The proceedings before such boards are not expected to be as formal and cumbrous as the proceedings of courts; indeed, the greater flexibility which such bodies must possess if they are to discharge their duties seems to demand greater freedom of action. If notice, either actual or constructive, of the commencement of the proceedings before such a body be required to be given to the parties interested and they be given full and free opportunity to be heard and present evidence, it is generally held sufficient even though notice of intermediate steps in the proceeding be not required or given."

Sec. 195.03 (5), Stats., provides:

*"Technicalities disregarded.* A substantial compliance with the requirements of the statutes shall be sufficient to give effect to all rules, orders, acts, and regulations of the commission and they shall not be declared inoperative, illegal, or void for any omission of a technical nature in respect thereto."

In the absence of any showing of prejudice, and the parties complaining having actual knowledge of and participating in the proceedings, as in this case, they will not be heard to complain of the failure to give notice. *Florida Citrus Comm. v. United States* (D. C. Fla. 1956), 144 Fed. Supp. 517, affirmed, 352 U. S. 1021, 77 Sup. Ct. 589, 1 L. Ed. (2d) 595.

The trial court found and we agree that the commission afforded a full and fair hearing to all parties who might have been interested in the subject matter of the application; that the statutes were complied with and all notices were given as required; that no notice to the central-agency communities was necessary; witnesses were not seriously inconvenienced by having to travel up to 85 miles, and all witnesses who appeared were heard.

The second issue presented by appellants is that the commission acted in excess of its statutory authority, that its findings and decision are unsupported by substantial evidence,

and that the findings of fact and order based thereon are arbitrary and capricious.

Sec. 227.20, Stats., provides:

"Scope of review. (1) . . . The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions, or decisions being:

"(a) Contrary to constitutional rights or privileges; or

"(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; or

"(c) Made or promulgated upon unlawful procedure; or

"(d) Unsupported by substantial evidence in view of the entire record as submitted; or

"(e) Arbitrary or capricious."

The record reveals that in 1957, the Chicago & North Western Railway Company sustained a net loss in its operations of $416,000. In the first two months of 1958, the loss sustained was $1,797,000. The working capital of the railway company decreased over $20,000,000 from 1947 to 1958. Operations by the Chicago & North Western Railway Company in Wisconsin produced a loss of $1,949,000 in 1957. The company's shortage of funds has seriously affected basic heavy maintenance, the use of the new Clinton carshop to manufacture and repair badly needed freight cars, and other vital programs for rehabilitation of the railroad.

The record further reveals that the agent at Cobb in 1957 spent an average of one hour and three minutes per day doing railway work, and the agent at Livingston expended an average of twenty-three minutes per day; that Johnson Creek has about one revenue car per working day, and that the average station workload per working day was twenty minutes for the Chicago & North Western Railway, twenty-five minutes for other activities, and forty-five minutes in total. In 1957, the agent at Sharon was on duty an average of eleven hours for each revenue car received or forwarded. The workload for railway company transactions totaled

an average of only twenty-nine minutes per working day. Other activities totaled an average of one hour and seven minutes. At Dalton the agent in 1957 was on duty for an average of fifteen hours for each single revenue car received or forwarded. The workload data submitted in the proceedings showed that the agent at Dalton in 1957 had an average workload per day of only forty-eight minutes, including all work done for the railway company and otherwise. Combined with the workload for the proposed central agency of Friesland, the total time spent for an average working day for both stations would be one hour and thirty-nine minutes. In 1957, the Bonduel agent was paid for an average of twelve hours for each revenue car received or forwarded. The total workload time was one hour and twenty-five minutes, of which twenty-eight minutes was devoted to railway company work. At Galesville the agent spent an average of four hours per revenue car. The total time spent by the agent, when the average workload for both Galesville and Trempealeau is combined is two hours and forty-six minutes. At Almond there were 321 carloads of revenue freight during the entire year of 1957, constituting an average of one for every six hours of the agent's time. The agent spent fifty-three minutes as an average station workload per working day for railroad business, and thirty-nine minutes were spent for other activities. The Verona agent spent an average in 1957, of one hour and eight minutes per working day doing railroad work, and one hour and fifteen minutes doing other work.

The findings of the commission disclose that:

"Agency stations are now an average of 9.7 miles apart but in a number of situations the actual distance between agencies is in excess of 20 miles."

In summarizing the salient data on costs, the commission found:

"The cost of providing agency personnel, represented by the Order of Railroad Telegraphers, has increased $1.21 per

man-hour since 1946. . . . the labor cost of operating a one-man station has approximately doubled in this period whereas the workload has materially decreased creating unproductive time and economic waste where reductions in employment cannot be effected. . . .

"The financial condition of the carrier dictates the necessity for economies to generate funds for improved facilities, equipment, and deferred maintenance. . . .

". . . The cost of materials and supplies has increased 76 per cent from 1947 to 1957, and wage rates 94 per cent so that total labor costs, despite sharp reductions in employment, presently represent 64 per cent of operating expense. Revenue per ton-mile has not sufficiently increased to absorb such added costs, and depreciation charged based on original cost are inadequate for necessary replacement at inflated prices."

Regarding the adverse financial position of the railroad, the commission found:

"The rate of return earned on applicant's investment in property devoted to all transportation service has averaged only 0.7 per cent over the last six years with no single year during that period yielding a return in excess of 1.2 per cent, and two years producing no return whatsoever. In three of the years, net losses were incurred which, combined, exceeded net income of the remaining three years."

The following finding demonstrates the justification for the plan:

"Authorization of the application as submitted contemplates an annual saving of $509,217 for the 104 agency positions to be abolished within the state. . . .

"The savings that would be created by introduction of the central-agency plan in Wisconsin and surrounding states would be directed to necessary improvements vital to more-efficient operation and necessary transportation services in the greater public interest. The immediate improvements advocated are the acquisition of freight cars, expanded maintenance program, competitive-rate reductions, and the installation of integrated data processing equipment. The latter will facilitate recording work and will afford quick dissemination of information to the shipping public.

". . . the rapid development of motor transport and the construction of public highways and waterways have resulted in the movement of freight traffic by other methods than rail, to the extent that rail traffic today largely consists of bulk commodities, particularly suited to mass transportation. These factors, leading to the reduction and redistribution of traffic, have adversely affected the volume of business activity at rail stations. In post-World War II years, there has also occurred a vast change in railroad operational methods stemming from complete dieselization, centralized train control, automatic block and signal controls, and interlockers. These technological improvements have likewise decreased the agent's workload as related to operational and safety duties."

For the sake of national defense, as well as for economic progress, each form of transportation should be fitted into its proper place in an integrated transportation system, and each should be so regulated, in relation to all others, that it can perform efficiently in the public interest, with an absolute minimum of waste. There is no logic whatever in having a system that has proven obsolete in method and which is bound to result in waste, delay, and inefficiency, and even national danger.

The commission found the old system excessively wasteful. The railroad introduced evidence of a detailed work study giving for each individual station the respective amounts of the various types of traffic handled. The findings state:

"For the 104 stations at which agents are proposed to be withdrawn, the daily station workload, including express and Western Union business, averaged one hour and ten minutes."

And the findings concluded that:

". . . an eight-hour daily assignment of agency duty is in excess of that which is reasonable to the carrier or the public, and is not in the public interest."

And again the commission found:

"When considering only the Chicago & North Western Railway traffic, the daily workload at the stations so involved, averages thirty-four minutes, ranging from a low of four and one-half minutes to a high of one hour and forty-one minutes. . . .

". . . the labor costs of operating a one-man station has approximately doubled in this period [since 1946] whereas the workload has materially decreased creating unproductive time and economic waste where reductions in employment cannot be effected."

The order of the commission is as follows:

"1. That the Chicago & North Western Railway Company be and it hereby is authorized to place in effect a central-agency plan whereby the resident agent at the designated central stations shall perform full agency service at the designated associate stations; and further the Chicago & North Western Railway Company is ordered to observe the assignment of hours of central-stations resident agents at the station offices of associate stations as prescribed. . . .

"2. That the Chicago & North Western Railway Company shall provide seasonal resident agency service during the period May 15th to September 15th each year at the stations of Three Lakes, Lac du Flambeau, and Lake Tomahawk included as associate stations, of the central-agency plan in paragraph 1 . . .

"3. That the withdrawal of resident agents at the Chicago & North Western Railway Company stations of Cuba City and Birchwood be and the same is hereby denied.

"4. That the Chicago & North Western Railway Company stations of Cuba City and Birchwood be included in the central-agency plan as central stations serving the associate stations of Benton and Brill respectively and observing assignments of hours . . .

"5. That the application of the Chicago & North Western Railway Company to discontinue agency service, remove depot buildings and to amend tariffs limiting service to pre-paid carload traffic at the stations of Stitzer and Sheboygan Falls be and the same is hereby denied.

"6. That the Chicago & North Western Railway Company stations of Stitzer and Sheboygan Falls be incorporated as associate stations in the central-agency plan with Fennimore and Sheboygan Falls designated respectively as the central-agency stations . . .

"7. That the Chicago & North Western Railway Company be and it hereby is authorized to establish Hudson and Genoa City as central-agency stations, and Florence as an associate station in the central-agency plan . . .

"8. That the application of the Chicago & North Western Railway Company with respect to the discontinuance of less-than-carload freight service at associate stations herein be and hereby is denied.

"9. That the Chicago & North Western Railway Company be and it hereby is authorized to discontinue agency service and remove depot facilities at Necedah and Merrimac and to eliminate said stations from all but prepaid carload freight tariffs.

"10. That the Chicago & North Western Railway Company post assigned hours in a prominent place at each central and associate station and submit schedules of said assignments to this commission within thirty days after introduction of the central-agency plan and on ten days' notice of any subsequent changes.

"11. That all other aspects of the application herein be and hereby are denied.

"12. That this order shall become effective twenty days from the date hereof and that publication of tariff changes necessary shall be made thereafter on not less than ten days' notice to the commission and the public."

We find no basis for appellants' contention that the findings of the commission are not supported by substantial evidence. There is no contradiction of the fact that the railroad was in a critical financial condition, as shown by the evidence, and that this would continue to increase from year to year and be aggravated by expenditures for replacements at increased prices. It is also quite evident that the railroads of today are the outstanding unsubsidized "sick man" of transportation. There is no doubt that the entire railroad transportation system needs overhauling if we are to continue to have

railroad transportation. The record discloses that all related facts were given consideration by the commission.

Sec. 227.20 (2), Stats., provides:

"Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. . . ."

In *Milwaukee E. R. & T. Co. v. Public Service Comm.* (1952), 261 Wis. 299, 302, 52 N. W. (2d) 876, this court said:

"The court must also recognize that the commission has expert knowledge, that such knowledge may be applied by it, and that even though we might differ with the commission, we are without power to substitute our views of what may be reasonable. . . . We may not disturb the commission's findings."

The case is before us on an extensive record. The evidence was ample to give a comprehensive view of the entire financial situation, and the figures indicate the operating losses are an obstacle to improving the service and this is a matter of public concern. The return to the carrier on its investments should be reasonably sufficient to assure confidence in the financial soundness of the railroad company and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. There is no contradiction of the fact that the carrier is operating at a loss, as shown by its accounts offered in evidence, and that it will continue to increase from year to year and the service to the public will be greatly hampered by inability to purchase the necessary equipment.

The record shows the evidence intricate, and the consideration of the case deliberate, careful, and exhaustive. When all

relevant facts had been ascertained, there remained the exercise of judgment involved in formulating workable plans. There is no basis, either in fact or in law, for the assumption that the commission or the trial court acted arbitrarily, capriciously, unreasonably, or on the basis of insufficient evidence.

The next issue raised by the appellants is whether the trial court abused its discretion in denying a motion to amend their petition for review under ch. 227, Stats., so as to allege secs. 192.56 and 196.81, Stats., unconstitutional as an invalid delegation of legislative and judicial power.

The trial court denied the motion for the reason that appellants had failed to raise such issue in their petition for rehearing before the commission as provided in sec. 196.405 (2), Stats., that:

". . . No person or corporation shall in any court urge or rely on any ground not so set forth in said application for rehearing."

We have held that the specified and prescribed method for review of an administrative agency's order is exclusive, and that any person using such remedy must pursue it to seek redress. *Perkins v. Peacock* (1953), 263 Wis. 644, 58 N. W. (2d) 536.

Appellants contend the case of *Petition of Heffernan* (1943), 244 Wis. 104, 11 N. W. (2d) 680, is authority for their motion. The trial court held that the *Heffernan Case* is not applicable because it does not involve a review proceeding under ch. 227, Stats., and no rehearing statute like sec. 196.405 (2), Stats., was involved, and we agree.

In *State ex rel. Ball v. McPhee* (1959), 6 Wis. (2d) 190, 201, 94 N. W. (2d) 711, this court said:

"Ch. 227, Stats., is not limited to providing a method of review of administrative agency decisions, but prescribes the

procedure which such agencies must follow in hearing and determining contested matters."

This court said that the legislature can, by a specific statute not embodied in ch. 227, Stats., prescribe other methods. In the case at bar, the method is prescribed in sec. 196.405 (2), Stats., providing for rehearing before the commission.

The purpose of a rehearing statute, including constitutional questions, is to enable the administrative agency to correct any errors in the proceedings before it. Hence it was incumbent upon appellants, in view of the express language of sec. 196.405 (2), Stats., and its purpose, to have raised the issue so that the commission could then have proceeded to have avoided the alleged error, if it existed.

It is clear that appellants' contention is clearly out of harmony with the fundamental purposes of ch. 196, Stats., and specifically with the provisions of sec. 196.405 (2), Stats.

The final issue of the appellants is whether the trial court abused its discretion in denying the appellants' motion under sec. 227.19 (1), Stats., for leave to remand the record in the review proceedings to the Public Service Commission for further evidence showing the railroad enjoyed a net profit of $2,820,085 in the year 1958.

The trial court, in its opinion denying appellants' motion stated:

". . . that the inclusion of such evidence could not materially affect the determination of the commission which was faced with the basic question of determining existing and prospective need for the railroad services in question. It is most significant that a net profit of $2,820,085 produces a return to the railroad of less than one half of one per cent upon a depreciated investment of approximately $690,000,000. This extremely low rate of return indicates positively that there has been no such change in the over-all condition of the railroad as to change materially its financial status.

"Much time and effort was involved in conducting the hearings before the commission. The court should not open the door to further hearings which would necessarily involve much additional time and effort without a clear showing that the evidence is calculated to have a substantial bearing upon the vital issues in the case. Such a showing has not been made in the case at bar."

In the case of *Interstate Commerce Comm. v. Jersey City* (1944), 322 U. S. 503, 514, 64 Sup. Ct. 1129, 88 L. Ed. 1420, the court said:

"If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion."

We find no abuse of discretion in the trial court's denial of the motion.

*By the Court.*—The judgment and the two intermediate orders of the trial court are affirmed.