STATE, Appellant, v. CHIPPEWA CABLE COMPANY, INC., Respondent.

*No. 161. Argued September 9, 1970.—Decided November 3, 1970.*
(Also reported in 180 N. W. 2d 714.)

For the appellant the cause was argued by *George B. Schwahn*, assistant attorney general, with whom on the briefs was *Robert W. Warren*, attorney general.

For the respondent there was a brief and oral argument by *Thomas Devine* of Chippewa Falls.

WILKIE, J. The issues presented on this appeal are as follows:

1. Did the commission lack jurisdiction to control the erection of respondent's tower under sec. 114.135 (6)–(9), Stats?

2. Did the commission have primary jurisdiction to determine whether the respondent's tower was so great a hazard to air travel as to require denial of respondent's application for a permit under sec. 114.135 (6), Stats., thereby preventing the circuit court from making an independent determination of whether respondent's tower was so substantial a hazard that the application for a permit was foredoomed to denial at a hearing?

3. Was the circuit court's determination that the tower was not so substantial a hazard to air traffic that the respondent's application for a permit would have been foredoomed to denial at a timely hearing against the great weight and clear preponderance of the evidence?

### 1. *Commission jurisdiction to control erection of respondent's tower.*

What are the critical facts concerning the actual height of the tower in relation to the surrounding heights within a mile radius of that tower?

At the request of the commission, Edgar J. Carrington, a professional consulting engineer, did a topographical survey of the area within one mile of respondent's tower. That survey revealed that the low point in the area was located at the edge of a creek in Irvine Park near Chippewa Falls, in the periphery of the one-mile radius. That point was 854 feet above mean sea level (MSL). The base of respondent's tower was 1,099.75 feet above MSL and the top of the tower was 1,462.04 feet above MSL. Thus, the tower measured 362.29 feet from its base to its top. George M. Sklom, also a consulting engineer, did a topographic survey of the same area and determined that the average terrain within one mile of the tower was 1,001.75 feet above MSL.

Sec. 114.135 (7), Stats., prescribes the limits of the commission's power to control the erection of towers:

"For the purposes of sub. (6) the power and authority to control the erection of buildings, structures, towers and other objects by the state aeronautics commission shall be limited to those objects that would either extend to a height of *more than 500 feet above the ground or surface of the water within one mile of the location of the object,* or above a height determined by the ratio of one foot verticle to 40 feet horizontal measured from the nearest boundary of the nearest public airport within the state . . . ." (Emphasis supplied.)

It is clear that respondent's tower does not violate the "40 to one" provisions of this section. The Eau Claire airport is located at 888 feet MSL, and the tower

is 6.8 miles from the airport. Thus, the only question is whether the tower's top is "more than 500 feet above the ground or surface of the water within one mile." The respondent asks us to uphold the trial court's determination that the 500 feet must be measured from the average terrain within one mile. The state contends that we should abide by the commission's interpretation which is that the 500 feet should be measured from the lowest point. Since the top of the tower is 460.29 feet above the average terrain and 608.04 feet above the low point, the base for measurement is crucial.

It should be understood at the outset that this court has already determined in the first *State v. Chippewa Cable Co. Case* [6] that the distance of 500 feet is not to be measured from the highest point within one mile. However, we said there:

"Whether proper construction of the statute requires the measurement of 500 feet to begin at the lowest point in the area or at the average ground level in the area may depend on facts not now before the court." [7]

Furthermore, when this controversy was before us the second time,[8] we stated that in light of this statute's apparent purpose we would be inclined to agree with the state's interpretation.

"Unless facts appearing upon the trial show a good reason for construing the statute to require the 500 feet to be measured from an average elevation, it will necessarily follow that it must be measured from the elevation of the lowest point within a mile. In either case the meaning will have been determined by resort to the ordinary rules of construction." [9]

[6] *Supra,* footnote 3.
[7] *Id.* at page 304.
[8] *Supra,* footnote 4.
[9] *Id.* at page 606.

In *Scanlon v. Menasha*,[10] we observed:

"[W]e must ascertain the legislative intention as disclosed by the language of the statute in relation to its scope, history, context, subject matter, and the object intended to be remedied or accomplished."

The history of sec. 114.135, Stats., shows that as originally enacted the section dealt only with keeping "aerial approaches to any airport" in a condition suited for safe operation of aircraft.[11] In 1955, the preamble to the section was amended to declare the public interest not only in keeping airport approaches safe, but also in keeping the "navigable airspace over the state" in a safe condition. At the same time, subs. (6) through (10) were added.[12] From this we can infer that subs. (6) through (10) were added for the purpose of protecting navigable airspace, and the provisions regarding the commission's authority must be interpreted in light of this.

Respondent contends that since the Wisconsin statutes do not define the term "navigable airspace," in determining its meaning, we should rely on federal authorities in effect at the time of enactment which did define the term. Sec. 180 of Title 49 of the 1951 United States Code provided that "navigable airspace" means airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority (CAA). That basic definition is now found in 49 USCA, sec. 1301 (24). The administrator of the FAA has the authority to prescribe rules governing flight of aircraft, including rules governing safe altitudes of flight.[13] The following rule has been prescribed pursuant to this authority:

[10] (1962), 16 Wis. 2d 437, 442, 114 N. W. 2d 791.
[11] Ch. 269, sec. 13, Laws of 1943.
[12] Ch. 489, secs. 1 and 2, Laws of 1955.
[13] 49 USCA, sec. 1348 (c).

"**Minimum safe altitudes; general.** Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

" . . .

"(b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.

"(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure." [14]

The area in which the tower is located is sparsely populated but it is just northwest of the city of Chippewa Falls which is considered a congested area. Respondent argues that since "navigable airspace" does not begin until at least 500 feet above the ground, measurement from the low point within one mile is not necessary to protect that airspace. From this the respondent reasons that the commission's interpretation of sec. 114.135 (7), Stats., goes beyond the purpose stated in the preamble and consequently could not be the one intended by the legislature.

But this argument ignores the fact that 14 CFR, sec. 91.79, also states that aircraft may not operate closer than 500 feet to any structure. If we accept respondent's premise that "navigable airspace" includes only the space where planes are legally permitted to fly, no structure intrudes into it, and no structure can be regulated under sec. 114.135, Stats. This could not have been the legislature's intent.

Respondent argues that we are dealing with a statute in derogation of the common law which should be strictly construed so as to give the landowner the maximum use of his land. Specifically, respondent relies on the

---

[14] 14 CFR, sec. 91.79 (formerly 14 CFR, sec. 60.17).

common-law rule that a property owner owns airspace above his land.[15] The legislature has made this right subject to the right of flight over the land, though the right of flight is, in turn, limited to the extent that it interferes with the existing use of the land.[16] Thus, the legislature has made it clear that a balancing of the right of flight and common-law ownership rights is necessary. This court's construction of the statute must not ignore the legislature's intent to strike such a balance.

Respondent also contends that the statute is penal and, therefore, should be construed so as to minimize its penal character.[17] *Lang* was a negligence action in which the defendant railroad requested an instruction as to the effect of plaintiff's violation of certain safety standards applicable to "motor carriers" regarding stopping at railroad crossings. Plaintiff was a "motor carrier" but he was operating his vehicle for his own private purposes and carrying only his own property at the time of the accident. We conceded that the statute, if read literally, would apply to plaintiff, but found that the case did not come within the purpose of the statute. We also observed that the statute carried a penalty and we held that it should be read so as to minimize rather than extend its penal character.

The policy behind this canon of construction is to provide a standard which, if followed, will avoid penalty.[18] Although there are penalties attached to sec. 114.135, Stats., it does not require a person to put up his tower and take the risk of being prosecuted. If in doubt about the necessity of a permit, he can request one and if his request is denied he can appeal that

[15] 42 Am. Jur., *Property*, pp. 196, 197, sec. 14.

[16] Secs. 114.03 and 114.04, Stats.

[17] *Lang v. Chicago & N. W. Ry.* (1951), 258 Wis. 610, 46 N. W. 2d 844.

[18] 50 Am. Jur., *Statutes*, p. 430, sec. 407.

determination under the procedures provided in ch. 227. He need not take any risk in order to get a final decision on what standards apply to him, and therefore there is no need for application of this canon to protect him.

Finally respondent cites similar statutes from other jurisdictions which expressly provide that high structures should be measured from the highest point within one mile for purposes of determining whether they can be erected.[19] These statutes have little weight, since we can assume that if the legislature had based sec. 114.135 on them, it would also have expressly provided for measurement from the highest point.

In support of the commission's interpretation of sec. 114.135 (7), Stats., the state emphasizes that the commission's interpretation is consistent with the objective of protecting navigable airspace and has been consistently applied by it since the time of enactment of the statute. In *Mednis v. Industrial Comm.*[20] we stated:

"The construction and interpretation adopted by the administrative agency charged with the duty of applying the law is entitled to great weight in the courts."

There we accepted the industrial commission's interpretation of the term "pre-existing disability."[21]

In *Milwaukee Transformer Co. v. Industrial Comm.*[22] we said that the mere fact that a determination by the industrial commission is a conclusion of law does not

---

[19] *E.g.,* 22B Annot. Minnesota Stats., p. 248, sec. 360.83 (1966), and 5 Annot. Indiana Stats., p. 21, sec. 14–329 (b), (1964 replacement).

[20] (1965), 27 Wis. 2d 439, 444, 134 N. W. 2d 416.

[21] *See also: Libby, McNeill & Libby v. Wisconsin Employment Relations Comm.,* ante, 272, 179 N. W. 2d 805; *Cook v. Industrial Comm.* (1966), 31 Wis. 2d 232, 142 N. W. 2d 827; *Wisconsin Axle Division v. Industrial Comm.* (1953), 263 Wis. 529, 57 N. W. 2d 696, 60 N. W. 2d 383.

[22] (1964), 22 Wis. 2d 502, 126 N. W. 2d 6.

mean that this court will make an independent determination of what the conclusion should be.

> ". . . If several rules, or several applications of a rule are equally consistent with the purpose of the statute, the court will accept the agency's formulation . . . ." [23]

In that case we upheld the commission's interpretation of the term "misconduct" [24] within the meaning of sec. 108.04 (5), Stats.

Our principal reason for relying on the agency's interpretation of a statute is found in the comparative qualifications of the court and the agency. [25] The court is reluctant to substitute its own judgment for the agency's where the statute in question requires application of the agency's expertise. Although the agency's interpretation of a jurisdictional statute, as here, is entitled to less weight than its interpretation of other statutes, we must observe here that the commission (Division of Aeronautics) is made up of experts in the field of aviation safety who we may assume are knowledgeable about the problems (both existing and prospective) in the field. The commission has concluded that exercise of the maximum jurisdiction possible under the statute is necessary to permit it to adequately protect navigable airspace and it is reasonable to conclude, therefore, that the legislature must have intended to grant such jurisdiction.

We conclude that the commission's interpretation of sec. 114.135 (7), Stats., is correct and that the height of respondent's tower was correctly measured in rela-

---

[23] *Id.* at page 510.

[24] *See also: Tecumseh Products Co. v. Wisconsin Employment Relations Board* (1964), 23 Wis. 2d 118, 126 N. W. 2d 520; *Fitzgerald v. Globe-Union, Inc.* (1967), 35 Wis. 2d 332, 151 N. W. 2d 136.

[25] 4 Davis, *Administrative Law Treatise,* pp. 240, 242–246, sec. 30.09 (1958).

tion to the lowest point within a radius of one mile from the base of the tower.

## 2. *Did the commission have primary jurisdiction?*

When this controversy was before us in 1963,[26] we held that the circuit court should not have granted the state's demurrer to the respondent's fifth affirmative defense, which asserted that the state should be denied equitable relief because of its failure to follow its own rule [27] requiring it to grant an applicant a hearing before denying him a tall-structure permit. We said:

". . . The rule contemplates that there shall not be a final denial of an application without a hearing, and the statute provides for judicial review. It seems to us that the commission should have held its hearing long before the answer was served. If, upon hearing, the commission had determined that the permit should issue, that fact would not have excused past violations [for erecting a tower before getting the permit], for which defendant would remain liable for criminal penalties, but would have obviated need for injunctive relief. Had the commission decided, after hearing, to deny the application, the state would have had better standing to seek equitable relief than it does after long delay.

"This is a civil action to enjoin a continuing violation as a public nuisance. We think that unless the proof at the trial shows that tower is, by reason of exceeding the height allowable without a permit, so substantial a hazard to air traffic that the application was foredoomed to denial at a hearing, the failure of the commission to hold a hearing might, in the discretion of the court, deprive the state of equitable relief." [28]

The cable company interpreted this language to mean that it was too late for the commission to hold a hearing and that the circuit court must decide if the commission should be denied equitable relief. When the com-

---

[26] *Supra,* footnote 4.

[27] Sec. AER 3.01, 1 Wis. Adm. Code.

[28] *State v. Chippewa Cable Co., supra,* footnote 4, at page 607.

mission subsequently notified the respondent that a hearing would be held, the respondent withdrew its application for a permit and refused to participate. The hearing went ahead as scheduled, but only the commission presented evidence. The commission held that the tower was a hazard to air traffic and denied the permit. The trial court, however, agreed with respondent's interpretation of the second *Chippewa Cable Case,* and made an independent finding that the tower was not so substantial a hazard as to foredoom defendant's application to denial had a prompt hearing been held. He indicated that he would deny injunctive relief on that basis, even if this court overruled his interpretation of the jurisdictional standards of sec. 114.135 (7), Stats.

The state contends that the second *Chippewa Cable Case* did not foreclose the possibility of a hearing on defendant's application for a permit prior to the trial. It further contends that the doctrine of primary jurisdiction applies and that the commission should be the primary judge of the substantiality of the hazard to air traffic caused by the tower.

This court treated the doctrine of primary jurisdiction in *Wisconsin Collectors Asso. v. Thorp Finance Corp.*[29] Involved there was a suit alleging that one of Thorp's collection practices was a subterfuge to avoid the licensing provisions of sec. 218.04 (11), Stats. Thorp demurred, claiming that the circuit court had no subject-matter jurisdiction because the commissioner of banks had primary jurisdiction and had failed to exercise it. The circuit court held the matter in abeyance while taking testimony in the case and then found that the commissioner had primary jurisdiction and directed him to determine the dispute. This court recognized that agencies are designed to give uniformity and consistency to their fields of special knowledge, and that their expertise and flexible procedure make their fact-finding

---

[29] (1966), 32 Wis. 2d 36, 145 N. W. 2d 33.

a valuable public function. We did not think, however, that the fact that the agency had jurisdiction ousted the circuit court from its subject-matter jurisdiction.

". . . The standard, in our opinion, should not be power but comity. The court must consider which course would best serve the ends of justice. If the issue presented to the court involves exclusively factual issues within the peculiar expertise of the commission, the obviously better course would be to decline jurisdiction and to refer the matter to the agency. On the other hand, if statutory interpretation or issues of law are significant, the court may properly choose in its discretion to entertain the proceedings. The trial court should exercise its discretion with an understanding that the legislature has created the agency in order to afford a systematic method of fact-finding and policy-making and that the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention." [30]

We held, however, that the circuit court abused its discretion by referring the matter to the commission after holding an extensive trial. The trial court should have gone ahead and made findings and conclusions based on the record before it.

In *Best v. Humboldt Mining Co.*[31] the United States Supreme Court held it proper for a federal district court to permit the Bureau of Land Management of the Department of the Interior to determine the validity of mining claims, even though the United States had instituted an action for possession of the land involved. The decision was based on the special competence of the agency in the field.[32]

The doctrine of primary jurisdiction applies even where the administrative agency is incapable of giving the relief sought.

[30] *Id.* at pages 44, 45.

[31] (1963), 371 U. S. 334, 83 Sup. Ct. 379, 9 L. Ed. 2d 350.

[32] For other statements of the doctrine and its policy, *see* 3 Davis, *Administrative Law Treatise*, pp. 1–6, sec. 19.01.

"On the question of whether the doctrine applies to problems or relief which are beyond administrative jurisdiction, the theory seems reasonably clear. The test is not whether some parts of the case are within the exclusive jurisdiction of the courts; the test is whether some parts of the case are within the exclusive jurisdiction of the agency. Because of the purpose of the doctrine—to assure that the agency will not be by-passed on what is especially committed to it—and because resort to the courts is still open after the agency has acted, the doctrine applies even if the agency has no jurisdiction to grant the relief sought." [33]

The United States Supreme Court so held in *Far East Conference v. United States*.[34] That was an action by the United States to enjoin antitrust violations. The supreme court ruled that resort must first be had to the shipping board for a determination of whether the agreements involved were unjustly discriminatory and, therefore, unlawful, even though the board had no power to grant injunctive relief.

Here, the state contends that the question of the extent of the hazard created by respondent's tower is one which requires application of the commission's expertise on aeronautical safety, and the fact that the commission has no power to issue an injunction is inconsequential. It further contends that the only method for review of the agency's finding that the hazard was too great to allow a permit was by the procedure of ch. 227, Stats.,[35] and that because the defendant failed to seek such review, it cannot challenge the finding.

*Underwood v. Karns* [36] is in point. There a writ of mandamus was sought to compel the commissioner of the motor vehicle department to reinstate petitioner's driver's license. Sec. 344.03, Stats., provides that review

[33] 3 Davis, *Administrative Law Treatise*, p. 39, sec. 19.07.

[34] (1952), 342 U. S. 570, 72 Sup. Ct. 492, 96 L. Ed. 576.

[35] Sec. 114.315, Stats., provides that "Orders of the commission shall be subject to review in the manner provided in chapter 227."

[36] (1963), 21 Wis. 2d 175, 124 N. W. 2d 116.

of the commissioner's decision to revoke may be had within ten days in the manner provided in ch. 227. We refused mandamus because petitioner had an adequate remedy at law. We said that:

". . . Where a statute relating to an administrative agency provides a direct method of judicial review of agency action, such method of review is generally regarded as exclusive, especially where the statutory remedy is plain, speedy, and adequate." [37]

The state's contention that respondent is precluded from relitigating the question of the hazard caused by its tower is correct, unless the doctrine of primary jurisdiction is inapplicable.

The respondent asserts that the doctrine does not apply because prior to the hearing the application for a tower permit was withdrawn and, as a result, the commission had no jurisdiction to hold the hearing on the hazard created by the tower. The respondent misunderstands the scope of the commission's jurisdiction. The power and authority of the commission to determine whether a permit for a structure should be issued is limited only by the height of the structure.[38] Application for a permit is not necessary to give the commission subject-matter jurisdiction. Since there was subject-matter jurisdiction and the commission provided adequate notice of the hearing, respondent's withdrawal of his application did not affect the proceedings.

However, because this court, in the second *Chippewa Cable Case,* indicated that it was too late for a hearing before the commission, the doctrine of primary jurisdiction does not apply. We said there that the commission

[37] *Id.* at pages 179, 180. Other cases to the same effect are *Cobb v. Public Service Comm.* (1961), 12 Wis. 2d 441, 107 N. W. 2d 595, and *Nick v. State Highway Comm.* (1961), 13 Wis. 2d 511, 109 N. W. 2d 71, 111 N. W. 2d 95.

[38] Sec. 114.135 (6), (7), Stats.

violated its own rule by not granting defendant a hearing, and that

". . . unless the proof at the trial shows that the tower is . . . so substantial a hazard to air traffic that the application was foredoomed to denial at a hearing, the failure of the commission to hold a hearing might . . . deprive the state of equitable relief." [39]

This case presents one of the valid reasons for judicial intervention mentioned in *Wisconsin Collectors Asso. v. Thorp Finance Corp.*[40] The circuit court did not err in permitting respondent to present evidence bearing on the extent of the hazard created by the tower or in proceeding to make an independent determination of whether the tower was so substantial a hazard to air traffic as to be foredoomed to denial at a hearing.

3. *Was the circuit court's determination that the tower was not so substantial a hazard that the application was foredoomed to denial at a hearing against the great weight and clear preponderance of the evidence?*

While the trial court was incorrect in its interpretation of sec. 114.135 (7), Stats., it nevertheless proceeded to determine that the tower was not so substantial a hazard that respondent's application for a permit was foredoomed to denial at a hearing. In arguing that the determination is against the great weight and clear preponderance of the evidence, the state first attacks the credibility of respondent's primary witness, Lowell R. Wright, an eminently qualified aviation consultant specializing in obstructions to air navigation. The state argues that his opinion that the tower is not a hazard is incredible in view of his testimony that the FAA was forced to cancel two instrument-landing approach pro-

[39] *State v. Chippewa Cable Co., supra,* footnote 4, at page 607.
[40] *Supra,* footnote 29, at page 45.

cedures at the Eau Claire airport because of the tower. However, Wright pointed out that because of changes in the type and size of aircraft landing at the airport, these two approach procedures could not be reinstated even if respondent's tower were removed. The state dismisses this as an "after-the-fact" determination. It argues that the decision as to whether the tower is hazardous should be based on facts existing at the time respondent's permit was denied, not on facts existing at the time of trial. However, from the standpoint of air-traffic safety, it makes little sense to grant or deny injunctive relief on the basis of safety factors which existed eight years prior, if those factors are no longer present or relevant. We therefore reject the state's interpretation.

The state also disputes the admissibility and credibility of Wright's testimony that an instrument-landing service (ILS) facility could be installed at the airport without interference from defendant's tower. (An ILS facility is an electronic device which projects beams to guide planes into the proper glide path for a safe landing under conditions of unfavorable visibility.) The state argues that the testimony and the projected plan for installation of such a facility prepared by Wright are based on a hearsay conversation with FAA officials. The trial court sustained objections as to testimony regarding any such conversation, but correctly stated that Wright's opinion on the feasibility of an ILS facility at Eau Claire was admissible to the extent that it was based upon his expert knowledge of the requirements of such a facility. Wright indicated on cross-examination that his opinion and projections were based on his own knowledge of what an ILS approach must look like and on information found in FAA publications. Wright offered to produce the publications, but the state's counsel declined to pursue the matter.

The evidence presented by the state tended to show that in 1960 the FAA was forced to cancel two instru-

ment approach procedures because of the tower, requiring planes to make a difficult circling approach to land at the airport instead of a straight-in approach. There was testimony that the tower required increases in the minimum approach altitudes for landing at the airport, requiring a steeper rate of descent before the plane hit the runway, and that the tower created a hazard to a controlled approach to the airport under visual flight rules (VFR). Experts stated that the tower is located near the control zone for the Eau Claire airport (the area over and near an airport which planes may not enter without radio clearance), creating a hazard for planes flying VFR in the area. There was evidence that five persons were killed in 1962 when a small plane hit the tower, and that the airport masterplan called for the extension of a runway, thereby increasing the existing hazard from the tower.

On the other hand, as previously noted, Wright testified that the cancelled instrument approach procedures could not be reinstated even if the tower were removed. He testified that the presence of the tower did increase the approach minimums at the airport, but that since this increase did not require minimums which were unacceptable under established FAA standards, he did not consider it a hazard. He stated that the tower does not violate the FAA rules as to visual flying. He testified that pilots fly with reference to the highest point on the surface and he could not conceive of a 362-foot tower creating a hazard to a prudent pilot flying VFR. Planes passing over the area from the east are supposed to fly in the Victor 26 airway (an airlane designated at 2,900 feet above MSL). Wright felt the tower did not constitute a hazard for these planes flying under instrument rules even though it is 13 feet above the guidelines recommended by the FAA as to obstructions of this airlane because most planes pass over the area at 3,000

feet above MSL. The respondent's tower is only 1,462.04 feet above MSL and outside the control zone. Wright concluded that respondent's tower is a far lesser hazard than those within the zone. Wright had examined FAA reports which concluded that the 1962 plane crash was due to the pilot's lack of prudence, not to the hazard from the tower. As previously noted, he submitted a projection showing the feasibility of adding an instrument landing system facility at the airport without any hazard from the tower.

The respondent's evidence put in issue the state's contention that the tower created such a great hazard that an application for a permit would have been foredoomed to denial at a hearing by the commission. The case required resolution of a conflict in expert opinion. This was within the realm of the trier of fact;[41] in this case, the trial court. We must accept its determination unless it is against the great weight and clear preponderance of the evidence.[42] We see no basis for that conclusion in this case.

*By the Court.*—Judgment affirmed.

HEFFERNAN, J., took no part.

[41] *E. L. Chester Co. v. Wisconsin Power & Light Co.* (1933), 211 Wis. 158, 247 N. W. 861.

[42] *State v. Conway* (1967), 34 Wis. 2d 76, 148 N. W. 2d 721.