KASKI and others, Appellants, v. FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF MADISON, Respondent.

*No. 684 (1974). Argued March 4, 1976.—Decided April 7, 1976.*
(Also reported in 240 N. W. 2d 367.)

For the appellants there was a brief by *Ken Hur Law Offices* of Madison, and oral argument by *J. Thomas Haley.*

For the respondent there was a brief by *Axley, Brynelson, Herrick & Gehl* of Madison, and oral argument by *Frank J. Bucaida.*

HEFFERNAN, J. The plaintiffs, Wayne E. and Lillyan Kaski, brought an action on behalf of themselves and

others allegedly similarly situated to declare that an interest rate escalation clause contained in the mortgage note given to First Federal Savings and Loan Association of Madison is invalid because it is unconscionable and is vague and indefinite. They ask that the mortgage interest be restored to the rate agreed upon in the original mortgage and note executed in June of 1967.

Following defendant's demurrer, the trial judge held that the plaintiffs had failed to state a cause of action under Wisconsin law and entered judgment dismissing the complaint. We conclude that Wisconsin law, however, is inapplicable, because the defendant, a federal savings and loan association, is, in respect to the matters under consideration, subject to federal law. Because the applicability of federal law, or the requirements of the federal law, were never presented to the trial court, we reverse under sec. 251.09, Stats., for reconsideration.

The facts of this case reveal that the Kaskis originally contracted to pay First Federal Savings and Loan Association six and one-half percent interest on their mortgage loan balance. In September of 1973, the Kaskis were notified that, because of economic conditions, and pursuant to the interest escalation clause contained in the mortgage agreement, the rate of interest was being increased to seven and one-half percent[1] on February 1, 1974.

This action was commenced on January 29, 1974. In the course of the proceedings, the circuit court held, pursuant to a demurrer, that the class action was inappro-

---

[1] The mortgage note contained the following provision:

"The rate of interest stipulated herein may be increased at the option of the Association; provided, however, that the Association may not exercise such right in less than 3 years from the date of the loan, and then only upon at least four months' written notice to the borrower; and provided that in the event of such an increase in the stipulated rate of interest the borrower may prepay the loan within such notice period without penalty."

priate, because it was alleged that the original signing of the escalation clause was procured by deceit. The basis for this holding, with which we agree, was that a cause of action based upon deceit—apparently a form of fraud in the original execution of the mortgage papers—was for a personal tort, which does not lend itself to a class action.

The trial judge also held that the agreement was not vague or indefinite, was not unconscionable or contrary to public policy, and did not violate the statute of frauds. Basically, the trial judge concluded that the escalation clause was lawful, because it followed the provisions of sec. 215.21 (3) (b), Stats.,[2] which expressly authorizes escalation clauses.

While the trial judge did not approach the problem posed by sec. 215.21 (3) (b), Stats., in the manner that this court did in the recent case of *Security Savings & Loan Asso. v. Wauwatosa Colony, Inc.* (1976), 71 Wis. 2d 174, 237 N. W. 2d 729, he concluded that section was controlling and validated the escalation practice of the defendant, First Federal Savings and Loan Association. Were there no more to this case than the right of a savings and loan association organized under ch. 215, to incorporate an interest escalation clause in the mortgage note, the issues in this case would be moot.

*Security Savings & Loan Asso., supra,* validated escalation clauses in respect to Wisconsin savings and loan associations and held that even a second escalation may be permitted under a properly drafted agreement between the parties. We conclude, however, that, under the language of the Wisconsin statutes, ch. 215, Stats., is inapplicable to federal savings and loan associations.

---

[2] "215.21 (3) (b) The mortgage or mortgage note may provide that the interest rate may be increased after 3 years from the date thereof, by giving to the borrower at least 4 months' notice of such intention. The borrower may, after receipt of such notice, repay his loan within the time specified in such notice without the payment of any penalty."

In sec. 215.01, Stats., the legislature distinguished state savings and loan associations from federal savings and loan associations. Sec. 215.01 (1) defines an association organized under sec. 215.05, while sec. 215.01 (7) defines federal savings and loan associations as being those organized under the Federal Home Owners' Loan Act of 1933.

A perusal of the statutory rules in ch. 215, Stats., shows that most of them apply only to state associations. Whenever the statute is intended to apply to federally organized savings and loan associations, they are specifically referred to by that name. By its terms, sec. 215.21, under which appears the escalation clause, sec. 215.21 (3) (b), in its initial sentence, appears to limit that section to "associations."

Sec. 215.26 (7), Stats., does, however, confer upon federal savings and loan associations:

". . . all of the rights, powers, privileges, benefits, immunities and exemptions that are now provided or that may be hereafter provided by the laws of this state for associations organized under the laws of this state . . . ."

While this statute could in some instances be construed to constitute a general grant of power to federal savings and loan associations, other sections of the statutes clearly support the conclusion that the legislature is precluded from the regulation of the lending practices of federal savings and loan associations, and the purpose of sec. 215.26 (7) appears merely to prohibit discrimination against federal associations.

Still stronger evidence of an intent to exclude federal savings and loan associations from state regulation is found in sec. 215.29 (2), Stats., which provides that, upon the conversion of a state association to a federal savings and loan association, it "shall cease to be supervised by this state."

Therefore, the Wisconsin statutes, in the main, disclaim any attempt to control, regulate, or supervise the

practices of federal savings and loan associations doing business in this state. If the law of savings and loan associations were merely silent on the question of the authority of the state to regulate interest escalation clauses, it would be the duty of the trial court, and of this court, to determine the efficacy of the agreement between the parties under the Wisconsin common law and other statutes that may be pertinent to contracts entered into in this jurisdiction.

The defendant, however, is a federal savings and loan association organized and chartered by the Federal Home Loan Bank Board, Home Owners' Loan Act of 1933, as amended, sec. 1461, ff., of Title 12 USCA. By the congressional act, savings and loan associations receiving their charters under that act are instrumentalities and agencies of the United States. *Ochs v. Washington Heights Federal Savings & Loan Asso.* (1966), 17 N. Y. 2d 82, 268 N. Y. S. 2d 294, 215 N. E. 2d 485, and *People of State of California v. Coast Federal Savings & Loan Asso.* (S. D. Cal. 1951), 98 Fed. Supp. 311.

The fact that a federal savings and loan association, such as the defendant in the instant case, is chartered under a comprehensive federal law and is, by law, an instrumentality of the United States raises the question of whether the law applicable to it in respects not specifically acknowledged to be within the authority of the states is preempted by the comprehensive statutory scheme enacted by Congress and by the rules of the Home Loan Bank Board pursuant to the United States Code.

That the rules and statutory regulations in respect to federal savings and loan associations are comprehensive and almost all-inclusive is not to be questioned. It has been said that a federal savings and loan institution is regulated by the Federal Home Loan Bank Board "from its cradle to its corporate grave." *Meyers v. Beverly Hills Federal Savings & Loan Asso.* (9th Cir. 1974), 499 Fed. 2d 1145, 1147.

Among the powers delegated to the Federal Home Loan Bank Board is the regulation of the lending and investment practices of federal savings and loan associations. 12 CFR, sec. 500.3. The Board has adopted comprehensive and detailed rules and regulations governing the lending of money for the purchase of real estate. 12 CFR, sec. 545.6.

12 USCA, sec. 1464, outlines specific procedures that are to be followed by the Board in enforcing the act and any rules or regulations thereunder. Sec. 1464 (a) provides:

"In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations,' and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions *in the United States.*" (Emphasis supplied.)

To implement this general authority, there are comprehensive rules regulating lending procedures, the power of the Board to enforce rules and regulations, authority of the Board to regulate lending and investment powers, procedures and methods of setting rates of interest, the regulation of installment rules, and a general proviso in regard to charters and bylaws, which in itself is subject to detailed regulation.

12 CFR, sec. 543.8, specifically acknowledges that state law controls in part in respect to the process of conversion to a federal savings and loan association.

In none of these regulations does there appear to be any reference to the authority of the Federal Home Loan Bank Board to permit escalation clauses of the nature utilized here or to prohibit them.

At oral argument, both parties conceded that no specific federal regulation was to be found on the subject. While the parties also agreed at oral argument that state usury statutes were applicable to interest rates by federal savings and loan associations, 12 USCA, sec. 1425b (e),[3] specifically excepts certain obligations from the operation of state usury laws. *See, however: First Federal Savings & Loan Asso. v. Norwood Realty Co., Inc.* (1956), 212 Ga. 524, 93 S. E. 2d 763, based upon 12 USCA, sec. 1425. There are frequent references in the federal law and regulations that a federal association may act when authorized by "statute," or "applicable law." It appears that, generally, the statutes and law referred to are those of the United States. *E.g.,* 12 CFR, sec. 545.6–11, provides in part:

"All loan instruments shall comply with applicable provisions of law, governmental regulations, and the Federal Association's charter."

It would appear that that provision of the Code of Federal Regulations would leave some control for the states. For example, it seems clear that the state recording statutes would be applicable. Nevertheless, the statutes clearly indicate that the regulatory power and the supervisory power of the Federal Home Loan Bank Board,

[3] "12 USCA, sec. 1425b (e). No member or nonmember association, institution, or bank or affiliate thereof, or any successor or assignee, or any endorser, guarantor, or surety thereof may plead, raise, or claim, directly or by counterclaim, set-off, or otherwise, with respect to any deposit or obligation of such member or nonmember association, institution, bank or affiliate, any defense, right, or benefit under any provision of a statute or constitution of a State or of a territory of the United States, or of any law of the District of Columbia, regulating or limiting the rate of interest which may be charged, taken, received, or reserved, and any such provision is hereby preempted, and no civil or criminal penalty which would otherwise be applicable under such provision shall apply to such member or nonmember association, institution, bank, or affiliate or to any other person."

which was created to effectuate the policies of Congress, should be free of any state legislative control which would impinge upon the exclusivity of the Congress and the Board to set policies relating to federal lending practices.

Federal statutes which are comprehensive in nature may be determined to be an occupation of the legislative field by Congress; and in the absence of specific legislative leeway given the states, it can be said that, merely by the pervasiveness of federal legislation and regulations, contrary or inconsistent state laws are suspended. *Parker v. Brown* (1943), 317 U. S. 341, 63 Sup. Ct. 307, 87 L. Ed. 315. The exclusion of state action may be implied from the nature of the congressional legislation and the subject matter, even though the laws of the United States do not expressly mandate exclusive federal regulation. *Bethlehem Steel Co. v. New York State Labor Relations Board* (1947), 330 U. S. 767, 67 Sup. Ct. 1026, 91 L. Ed. 1234.

This court has frequently held that, even in the absence of an express provision preempting a field to the federal government, such an intent can be implied from the circumstances or the nature of the federal control. *State v. Milwaukee Braves, Inc.* (1966), 31 Wis. 2d 699, 144 N. W. 2d 1, certiorari denied, 385 U. S. 990, 87 Sup. Ct. 598, 17 L. Ed. 2d 451. In *Wisconsin Labor Relations Board v. Fred Rueping Leather Co.* (1938), 228 Wis. 473, 487, 279 N. W. 673, we said:

". . . when congress enacts a measure of great scope and detail within the field of its competency, the completeness of the coverage standing alone is substantial evidence of an intent to exclude state legislation upon the subject. . . . In cases where the field is extremely narrow and well-defined, or where practical considerations admit of no sharing of power, the inference is very strong".

In *State ex rel. Cullen v. Ceci* (1970), 45 Wis. 2d 432, 449, 450, 173 N. W. 2d 175, we restated the criteria for

determining the congressional intent to preclude state regulation. Relying primarily upon *Pennsylvania v. Nelson* (1956), 350 U. S. 497, 76 Sup. Ct. 477, 100 L. Ed. 640, we said:

" '*First,* "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." '
. . .
" '*Second,* the federal statutes "touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject." ' . . .
" '*Third,* enforcement of state sedition acts presents a serious danger of conflict with the administration of the federal program.' "

Applying these general principles of law to the case at hand, it is apparent that Congress has substantially occupied the field in regard to the regulation of federal savings and loan associations, particularly in the area of the regulation of lending practices. This scheme of federal regulation is pervasive. Moreover, it has long been held that the establishment of a federal system of banking or of lending is of such importance in our national life that, for the most part, state laws should not be allowed to interfere. *McCulloch v. Maryland* (1819), 17 U. S. (4 Wheaton) 316, 4 L. Ed. 579. It is apparent that the Congress considered that the regulation of lending procedures of federal institutions was one that required national and uniform regulation.

In federal cases arising in the state of Wisconsin, the courts have held that Congress intended to occupy the field of control of federally chartered savings and loan associations and has delegated the regulatory authority to the Federal Home Loan Bank Board. In *United States ex rel. State of Wisconsin v. First Federal Savings & Loan Asso.* (E. D. Wis. 1957), 151 Fed. Supp. 690, 698, the district court, quoting from *Springfield Institu-*

*tion for Savings v. Worcester Federal Savings & Loan Ass'n* (1952), 329 Mass. 184, 107 N. E. 2d 315, stated:

" 'We see no reason to suppose that Congress intended that the board should make regulations which should not be of uniform application throughout the country.' "

In *First Federal Savings & Loan Ass'n of Wisconsin v. Finnegan* (W. D. Wis. 1937), 19 Fed. Supp. 678, 680, affirmed *sub nom. First Federal Savings & Loan Ass'n of Wisconsin v. Loomis* (7th Cir. 1938), 97 Fed. 2d 831, the court held:

". . . plaintiff [federal savings and loan association] is a corporation organized and existing pursuant to and by virtue of said act [Home Owners' Loan Act], and has the lawful right to transact business as a federal savings and loan association within the state of Wisconsin, and that as a federal savings and loan association it is under the sole authority and control of the laws of the United States."

Similar language has appeared in *Federal Savings & Loan Ins. Corp. v. Kearney Trust Co.* (8th Cir. 1945), 151 Fed. 2d 720, 725; *Murphy v. Colonial Federal Savings & Loan Asso.* (2d Cir. 1967), 388 Fed. 2d 609, 612; and *Elwert v. Pacific First Federal Savings & Loan Asso. of Tacoma, Washington* (D. Ore. 1956), 138 Fed. Supp. 395, 401.

Conversely, in *Pearson v. First Federal Savings & Loan Asso.* (Fla. 1963), 149 So. 2d 891, 894, 895, the court said:

"It is a well-established rule that federal savings and loan associations are subject only to state law which does not interfere with the purposes for which it was created, does not destroy its efficiency, and does not conflict with paramount federal law."

The general tenor of these cases is that any regulatory power which a state attempts to exercise that potentially

conflicts with federal legislation or its purpose, or that results in lack of uniformity in the internal management or lending practices of federal savings and loan associations, is subordinate to federal law. The regulation of loan practices directly affects the internal management and operations of federal associations and therefore requires uniform federal control. The present litigation ought, therefore, be resolved as a matter of federal law.

The fact that we conclude that federal law should be applied by the trial court to the resolution of this problem does not mean that the courts of the state of Wisconsin are without subject-matter jurisdiction. In *Charles Dowd Box Co., Inc. v. Courtney* (1962), 368 U. S. 502, 507, 82 Sup. Ct. 519, 7 L. Ed. 2d 483, the United States Supreme Court said:

". . . nothing in the concept of our federal system prevents state courts from enforcing rights created by the federal law. Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule."

We have followed that position in the courts of this state and have held generally that, when there is no express provision excluding jurisdiction or when there is no incompatibility in allowing concurrent jurisdiction, the courts of Wisconsin will exercise subject-matter jurisdiction and apply the federal law.

The *Milwaukee Braves Case, supra,* is one in which this court exercised subject-matter jurisdiction but resolved the question as a matter of federal law. In *Moreland Corp. v. Retail Store Employees Union Local No. 444, AFL–CIO* (1962), 16 Wis. 2d 499, 114 N. W. 2d 876, and *Chicago & North Western Ry. Co. v. La Follette* (1965), 27 Wis. 2d 505, 135 N. W. 2d 269, we similarly retained jurisdiction, but applied federal law. In *McNeill v. Jacobson* (1972), 55 Wis. 2d 254, 198 N. W. 2d 611, this court applied the Code of Federal Regulations in

resolving the right of a federal savings and loan association to extend credit to a single borrower in excess of the limits allowed by the federal law. Most recently, in *Chicago & North Western Transportation Co. v. Thoreson Food Products, Inc.* (1976), 71 Wis. 2d 143, 238 N. W. 2d 69, we applied the provisions of the Interstate Commerce Act to a claim for the offset of damages against a freight charge.

To conclude, as we do, that the courts of the state of Wisconsin have subject-matter jurisdiction of the dispute before us does not necessarily mean that the court should proceed to a resolution of this dispute. Pre-judicial administrative action may be appropriate. *Browne v. Milwaukee Board of School Directors* (1975), 69 Wis. 2d 169, 230 N. W. 2d 704, reviewed some of the Wisconsin cases that discussed the circumstances in which a litigant or a court is obliged to yield to the administrative process before reaching a court decision. There may well be an administrative remedy under the regulations of the Federal Home Loan Bank Board to which a litigant is obligated to resort before a state court or any other court may proceed. Depending upon the federal regulations applicable here, the court under the exhaustion-of-remedies theory may be obliged to yield jurisdiction to federal administrative procedures.

In general, however, it can be said that, unless exclusive jurisdiction is given to the administrative agency by statute, a court has subject-matter jurisdiction regardless of whether a litigant ought to exhaust his administrative remedies before submitting his case to the courts.

This case may also pose a question of primary jurisdiction under which a court can in its discretion either hear a case or defer to the expertise of an administrative agency. That latter question, however, as pointed out in *Browne, supra,* is a question not of power but of comity. The discretion in that latter regard is usually predicated

upon whether there is a substantial factual dispute which should first be resolved by the administrative agency.[4]

It appears that this case may involve substantial questions of federal law which were not alluded to at trial and which were raised for the first time—and then but incompletely—by the respondent on appeal. It may well be that all the plaintiffs wished as a result of this litigation, was a determination of the problem which we have already made in *Security Savings & Loan Asso. v. Wauwatosa Colony, Inc., supra.* In that case, contrary to the desire of the plaintiffs herein, we held that escalation clauses are not unconscionable and are not violative of state law. However, in the event that the object of the present litigation is to determine whether First Federal Savings and Loan Association, under the federal law, is permitted to use an escalation-of-interest clause, resort must be made either to the application of federal law in the state trial court or in the appropriate federal administrative agency.

We conclude, however, that it was error to assume, as the parties initially did in the trial court, that the matter was one to be resolved wholly by state law. State law is not controlling unless it can be demonstrated that the federal law permits the application of sec. 215.21 (3) (b), Stats., to a federal savings and loan association doing business in Wisconsin. Neither the court nor the parties

---

[4] In addition to *Browne, supra* the following Wisconsin cases have discussed the question of primary jurisdiction or exhaustion of remedies in relation to subject-matter jurisdiction: *State v. Wisconsin Employment Relations Comm.* (1974), 65 Wis. 2d 624, 223 N. W. 2d 543; *State ex rel. Terry v. Traeger* (1973), 60 Wis. 2d 490, 211 N. W. 2d 4; *Sawejka v. Morgan* (1972), 56 Wis. 2d 70, 201 N. W. 2d 528; *State v. Dairyland Power Cooperative* (1971), 52 Wis. 2d 45, 187 N. W. 2d 878; *State v. Chippewa Cable Co., Inc.* (1970), 48 Wis. 2d 341, 180 N. W. 2d 714; *Metzger v. Wisconsin Dept. of Taxation* (1967), 35 Wis. 2d 119, 150 N. W. 2d 431; *Wisconsin Collectors Asso., Inc. v. Thorp Finance Corp.* (1966), 32 Wis. 2d 36, 145 N. W. 2d 33.

resorted at trial to the federal law, which, initially at least, must be dispositive of the question.

Because we conclude that the real issue was not tried, we reverse under the provisions of sec. 251.09, Stats., and remand to the trial court for further proceedings. In the event the plaintiffs do not move for a new trial within thirty days of the return of the record, the plaintiffs' complaint shall be dismissed. The plaintiffs' option for a new trial shall consist only of the right to move for a rehearing on the demurrer to the existing complaint. In the event the demurrer is again sustained, repleading becomes a question that rests in the discretion of the trial court.

*By the Court.*—Judgment reversed and cause remanded with the option given to the plaintiffs to move for a new trial not inconsistent with this opinion.