### FRANCIS X. SHEA v. FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF NEW HAVEN

BOGDANSKI, PETERS, ARMENTANO, SHEA and WRIGHT, Js.

Argued January 9—decision released May 26, 1981

*Francis X. Shea,* with whom, on the brief, were *Ronald E. Cassidento, Bruce S. Beck* and *Walter J. Williams,* for the appellant (plaintiff).

*John R. Lacey,* assistant attorney general, with whom, on the brief, were *Carl R. Ajello,* attorney general, and *Robert M. Langer,* assistant attorney general, for the appellant (intervening plaintiff).

*Shaun S. Sullivan,* with whom were *Linda L. Randell* and *Madeleine F. Grossman,* for the appellee (defendant).

BOGDANSKI, J. This appeal arises from a private antitrust action brought by the plaintiff, a member of the Connecticut bar, against the defendant, a federally chartered, state licensed savings and loan association. The complaint alleged: (1) that the defendant, in concert with a limited number of

attorneys, including four of its directors, maintained and wrongfully employed an exclusionary listing of attorneys; (2) that the defendant's conduct injured the professional practice of the plaintiff and other attorneys by steering clients toward attorneys favored with the defendant's stamp of approval and thus inducing clients to refuse to deal with attorneys excluded from the defendant's list; (3) that the defendant's conduct was designed to cause borrowers to assume either that only attorneys on the defendant's approved list may represent borrowers at closings when the defendant finances the mortgage or that the attorneys on the defendant's list provide better representation than unlisted attorneys to borrowers at such closings; and (4) that those acts violate the Connecticut Anti-Trust Act, General Statutes §§ 35-26, 35-27, and 35-28 (c) and (d).[1]

The defendant denied the allegations and, as a special defense, asserted that under the comprehensive scheme of regulations governing federal savings and loan associations, exclusive jurisdiction in this case lies with the Federal Home Loan Bank Board, pursuant to the Federal Home Loan Bank Act, and that the Superior Court, therefore,

[1] General Statutes § 35-26 provides: "Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful." Section 35-27 states: "Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful." Section 35-28 provides in pertinent part: "Without limiting section 35-26, every contract, combination, or conspiracy is unlawful when the same are for the purpose or have the effect of: . . . (c) allocating or dividing customers or markets . . . (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person."

had no subject matter jurisdiction. The attorney general intervened as a plaintiff. See General Statutes § 35-32.

Following a lengthy trial, the Superior Court concluded that federal law excluded this action from a state court's jurisdiction because the defendant is a federally chartered savings and loan association. To make unnecessary a retrial should its first conclusion prove incorrect, the court weighed the evidence produced at trial. On the merits the court found the issues for the defendant. From that judgment the plaintiff and the plaintiff-intervenor appealed. Thereafter, pursuant to an order of this court, the trial court filed a supplementary memorandum of decision. We reject the trial court's conclusion that it lacked subject matter jurisdiction but affirm its judgment on the merits. The judgment file states without specification that the court found the issues for the defendant. It therefore needs no correction.

## I

Subject matter jurisdiction is the power of the court to hear and determine cases of the general class to which the proceedings in question belong. *England* v. *Coventry,* 183 Conn. 362, 364, 439 A.2d 372 (1981); *Henry F. Raab Connecticut, Inc.* v. *J. W. Fisher Co.,* 183 Conn. 108, 112, 438 A.2d 834 (1981). The claims made by a plaintiff determine whether federal jurisdiction excludes state jurisdiction. *Eastern Shore Natural Gas Co.* v. *Stouffer Chemical Co.,* 298 A.2d 322, 326 (Del. 1972). See *Bell* v. *Hood,* 327 U.S. 678, 681, 66 S. Ct. 773, 90 L. Ed. 939 (1946). Nowhere in his complaint does the plaintiff invoke any federal statute or regulation.

The federal constitution's supremacy clause[2] suspends any state law that conflicts with federal law or that applies to issues which arise within an area exclusively occupied by federal law.[3] *Ray* v. *Atlantic Richfield Co.*, 435 U.S. 151, 157–58, 98 S. Ct. 988, 55 L. Ed. 2d 179 (1978); see *DeCanas* v. *Bica*, 424 U.S. 351, 356-65, 96 S. Ct. 933, 47 L. Ed. 2d 43 (1976); *Parker* v. *Brown*, 317 U.S. 341, 350, 63 S. Ct. 307, 87 L. Ed. 315 (1942). The possibility, however, that federal law has preempted the substantive state law upon which a plaintiff has relied and that the averments are therefore not legally sufficient to state a claim upon which relief can be granted does not deprive a court of subject matter jurisdiction; see *Bell* v. *Hood*, supra, 682; unless such jurisdiction is incompatible with congressional objectives. *Stratford* v. *Bridgeport*, 173 Conn. 303, 308–11, 377 A.2d 327 (1977); *Putterman* v. *Miller*, 133 Conn. 70, 72, 48 A.2d 235 (1946); *Kaski* v. *First Federal Savings & Loan Assn.*, 72 Wis. 2d 132, 142, 240 N.W.2d 367 (1976). See *Charles Dowd Box Co.* v. *Courtney*, 368 U.S. 502, 507, 82 S. Ct. 519, 7 L. Ed. 2d 483 (1962); *Claflin* v. *Houseman*, 93 U.S. 130, 136, 23 L. Ed. 833 (1876). Therefore, unless Congress expressly vested jurisdiction exclusively in the federal courts we should presume state courts

[2] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ." U.S. Const., art. VI.

[3] Even without an express declaration of preemption, the nature of the congressional legislation and the subject matter may exclude state legislation. *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U.S. 767, 772, 67 S. Ct. 1026, 91 L. Ed. 1234 (1947).

Federal regulations as well as statutes may have a preemptive effect. See *Ray* v. *Atlantic Richfield Co.*, 435 U.S. 151, 160–62, 98 S. Ct. 988, 55 L. Ed. 2d 179 (1978); *Free* v. *Bland*, 369 U.S. 663, 667–68, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962).

have concurrent jurisdiction.[4] *Sands* v. *Weingrad,* 99 Misc. 2d 598, 416 N.Y.S.2d 969 (1979); 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3527.

The Superior Court has jurisdiction of all matters expressly committed to it and of all other judicially cognizable matters not within the exclusive jurisdiction of another court. *Carten* v. *Carten,* 153 Conn. 603, 612, 219 A.2d 711 (1966). Section 35-33[5] of the General Statutes specifically confers on the Superior Court jurisdiction over any action brought for violation of the Connecticut Anti-Trust Act. See *Mazzola* v. *Southern New England Telephone Co.,* 169 Conn. 344, 354, 363 A.2d 170 (1975). Congress has not expressly vested in the federal courts exclusive jurisdiction over the claims raised by the plaintiff in cases where the defendant is a federal savings and loan association. Furthermore,

---

[4] The presumption of state jurisdiction in this case is particularly strong because federal courts have held that a federal savings and loan association's preemption defense does not provide federal subject matter jurisdiction for an action which arises under state law. *Home Federal Savings & Loan Assn.* v. *Ins. Department of Iowa,* 571 F.2d 423 (8th Cir. 1978); *Michigan Savings & Loan League* v. *Francis,* 490 F. Sup. 892 (E.D. Mich. 1980). See *Public Service Commission* v. *Wycoff Co.,* 344 U.S. 237, 248, 73 S. Ct. 236, 97 L. Ed. 291 (1952); *First Federal Savings & Loan Assn. of Boston* v. *Greenwald,* 591 F.2d 417, 422-23 (1st Cir. 1979). But see *Conference of Federal Savings & Loan Assns.* v. *Stein,* 604 F.2d 1256 (9th Cir. 1979), aff'd, 445 U.S. 921, 100 S. Ct. 1304, 63 L. Ed. 2d 754 (1980).

[5] General Statutes § 35-33 provides that "[t]he superior court of this state is hereby vested with jurisdiction to prevent and enjoin violations of this chapter. Any action or proceeding brought by the state, or any private party, for violation of the provisions of this chapter shall be brought in the superior court of the judicial district where the offense, or any part thereof, is committed, or in any judicial district where any of the alleged offenders reside or are found, or any agency resides or is found, or where any proprietor, association, firm, partnership, or corporate defendant does business."

state jurisdiction over this action is compatible with congressional objectives because the supremacy clause binds the judges in every state to refuse to enforce federally preempted state law. U.S. Const., art. VI. Thus, even if federal law preempted the Connecticut Anti-Trust Act, the Superior Court had subject matter jurisdiction to adjudicate the plaintiff's claims.[6] *Murphy* v. *Colonial Federal Savings & Loan Assn.*, 388 F.2d 609, 612 (2d Cir. 1967); *Home Federal Savings & Loan Assn.* v. *Ins. Department of Iowa*, 428 F. Sup. 992 (N.D. Iowa 1977), rev'd on other grounds, 571 F.2d 423 (8th Cir. 1978); *City Federal Savings & Loan Assn.* v. *Crowley*, 393 F. Sup. 644, 655 (E.D. Wis. 1975); *Kaski* v. *First Federal Savings & Loan Assn.*, supra, 142.[7]

---

[6] Our conclusion that the Connecticut courts have subject matter jurisdiction over the claims advanced by the plaintiff does not mean that Connecticut may apply its antitrust law to federal savings and loan associations under the averments of the complaint or that our courts must always proceed to resolve such disputes. *Kaski* v. *First Federal Savings & Loan Assn.*, 72 Wis. 2d 132, 143, 240 N.W.2d 367 (1976). We have acknowledged that federal law may preempt a state statute without ousting state court jurisdiction over a complaint arising under the preempted statute. Such a complaint, however, does not state a claim upon which relief can be granted. Furthermore, if state law applies but an administrative agency has concurrent jurisdiction with Connecticut courts, a court under the doctrine of primary jurisdiction may exercise its discretion to defer to the expertise of the administrative agency. *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 349, 363 A.2d 170 (1975).

[7] The district court in *California* v. *Coast Federal Savings & Loan Assn.*, 98 F. Sup. 311, 317–18 (S.D. Cal. 1951), apparently confused the distinct questions of exhausting administrative remedies, primary jurisdiction and exclusive subject matter jurisdiction in erroneously concluding that state courts had no subject matter jurisdiction over anything relating to the affairs of federal savings and loan associations. *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 349–50, 363 A.2d 170 (1975), correctly differentiates the questions.

## II

The defendant contends that Congress has occupied the field of regulating federal savings and loan associations, or, at least, the field of regulating such association's closing practices. The defendant also argues that under the circumstances of this particular case, state law impedes execution of the full purposes and objectives of Congress.

The particular circumstances of each case are of compelling importance in deciding whether federal law has preempted state law. Because the language, interpretation, and interaction of the state and federal laws and the likely or actual conflicts between the two statutory schemes must provide the answers to specific questions, no one test can work in all cases. *Hines* v. *Davidowitz,* 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941).

In areas of coincident federal and state regulation, United States Supreme Court decisions counsel restraint in seeking out conflicts where none clearly exists. *Exxon Corporation* v. *Governor of Maryland,* 437 U.S. 117, 130–32, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978). Absent persuasive reasons courts may not infer that federal regulation preempts state regulatory power. *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U.S. 132, 142, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963). Furthermore, when federal law preempts state law it does so only to the extent necessary to achieve federal goals. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware,* 414 U.S. 117, 127, 94 S. Ct. 383, 38 L. Ed. 2d 348 (1973). Ordinarily a state's exercise of its police power is not superseded unless: (1) Congress clearly has manifested an intent to exclu-

sively occupy a field; *Rice* v. *Santa Fe Elevator Corporation,* 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) ; (2) "compliance with both federal and state regulations is a physical impossibility"; *Florida Lime & Avocado Growers, Inc.* v. *Paul,* supra, 142–43; or (3) state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *DeCanas* v. *Bica,* supra, 363, quoting *Hines* v. *Davidowitz,* supra, 67.

If Congress has occupied a particular field, courts may not enforce even consistent or complementary state laws in the occupied area. Therefore, in applying the occupation basis for preemption, a court must determine the boundaries of the occupied field which, in turn, depend upon the breadth of the statutes in question. *Derenco, Inc.* v. *Benjamin Franklin Federal Savings & Loan Assn.,* 281 Or. 533, 542, 577 P.2d 477, cert. denied, 439 U.S. 1051, 99 S. Ct. 733, 58 L. Ed. 2d 712 (1978). Because courts must examine federal legislation to determine whether state law overlaps a congressionally occupied field they usually denominate the inquiry as a search for congressional intent to preclude state law. *National State Bank* v. *Long,* 630 F.2d 981, 985 (3d Cir. 1980).

We must infer that Congress intended to preclude state regulations when: (1) the pervasiveness of the federal regulations in a particular area makes reasonable the inference that Congress left no room for states to supplement them; (2) federal interests dominate the field; and (3) enforcement of state legislation presents a serious risk of conflict with the administration of the federal program. *Pennsylvania* v. *Nelson,* 350 U.S. 497, 502–506, 76

S. Ct. 477, 100 L. Ed. 640 (1956). Detailed legislation, however, does not always indicate a preemptive intent because legislation dealing with complex matters may necessarily involve considerable detail. *DeCanas* v. *Bica,* supra, 359–60. Furthermore, courts should not readily infer that Congress has deprived states of the power to act on interests "deeply rooted in local feeling and responsibility" which only peripherally concern an area controlled by nonconflicting federal legislation. *San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236, 243–44, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959).

Our task is to identify the character and purposes of the laws in question and to decide whether the state and federal schemes are irreconcilable. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware,* supra. 126–27. Both federal and Connecticut antitrust law attempt to promote competition in the marketplace. See *Northern Pacific R. Co.* v. *United States,* 356 U.S. 1, 4, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958). Federal antitrust law supplements state antitrust law.[8] Our federal system generally allows state antitrust laws to apply to transactions which, although having interstate aspects, significantly

---

[8] During discussion of the Sherman Act; 26 Stat. 209, 15 U.S.C. §§ 1–7; on the floor of the United States Senate, Senator John Sherman said: "This bill . . . has for its . . . object to invoke the aid of the courts of the United States to deal with the combinations . . . when they affect injuriously our foreign and interstate commerce . . . and in this way to supplement the enforcement of the established rules of the common and statute law by the courts of the several States in dealing with combinations that affect injuriously the industrial liberty of the citizens of these states. It is to arm the Federal courts within the limits of their constitutional power that they may co-operate with the State courts in checking, curbing, and controlling the most dangerous combinations that now threaten the business, property, and trade of the people of the United States." 21 Cong. Rec., Pt. 3, p. 2457 (1890).

affect state interests. *Younger* v. *Jensen,* 26 Cal. 3d 397, 405, 605 P.2d 813 (1980). Furthermore, the provisions of the Connecticut Anti-Trust Act on which the plaintiff relies generally conform to federal antitrust law. *Elida, Inc.* v. *Harmor Realty Corporation,* 177 Conn. 218, 226, 413 A.2d 1226 (1979).

The application of antitrust law to federal savings and loan associations does not require an exceptionally delicate accommodation because the scheme governing federal savings and loan associations ignores antitrust concerns.[9] *Wolfson* v. *Artisans Savings Bank,* 428 F. Sup. 1315, 1323 (D. Del. 1977). Furthermore, courts have not inferred that the Home Owners' Loan Act exempts federal savings and loan associations from application of the federal antitrust laws. *Central Savings & Loan Assn.* v. *Federal Home Loan Bank Board,* 422 F. 2d 504, 509 (8th Cir. 1970); *Wolfson* v. *Artisans Savings Bank,* supra, 1321–22; *Kinee* v. *Abraham Lincoln Federal Savings & Loan Assn.,* 365 F. Sup. 975, 981–82 (E.D. Pa. 1973).

---

[9] State antitrust laws may not apply to union organizational activity and some other areas covered by federal antitrust laws because in such exceptional areas carefully tailored federal antitrust law delicately accommodates federal policies that state antitrust laws either harmonize differently or fail to consider. *Connell Construction Co.* v. *Plumbers & Steamfitters,* 421 U.S. 616, 635–37, 95 S. Ct. 1830, 44 L. Ed. 2d 418 (1975).

The defendant argues that 12 C.F.R. § 563.35 (a) (3), which prohibits the conditioning of a loan upon the selection of a particular attorney to represent the borrower expresses the Federal Home Loan Bank Board's (board) considered judgment of the extent to which antitrust law applies to federal savings and loan associations' closing practices. The general counsel of the board, however, has noted that that provision "was not intended to, and does not supplant the antitrust laws in any manner." *Mortensen* v. *First Federal Savings & Loan Assn.,* No. 1763–73 (Coolahan, J.) (D. N.J. Nov. 3, 1977).

As a result of congressional dissatisfaction with the hodgepodge of inadequate state laws and practices in financing home construction, Congress enacted The Home Owners' Loan Act of 1933; 12 U.S.C. §§ 1461–1468 (HOLA); *Conference of Federal Savings & Loan Assns.* v. *Stein,* 604 F.2d 1256, 1257 (9th Cir. 1979), aff'd, 445 U.S. 921, 100 S. Ct. 1304, 63 L. Ed. 2d 754 (1980); "to provide local mutual thrift institutions in which people may invest their funds . . . to provide for the financing of homes." 12 U.S.C. § 1464 (a). HOLA subjects the defendant and all federal savings and loan associations to regulations by the Federal Home Loan Bank Board (board). This statutory scheme authorizes the board "under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations' . . . and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions." 12 U.S.C. § 1464 (a); *Fahey* v. *Mallonee,* 332 U.S. 245, 67 S. Ct. 1552, 91 L. Ed. 2030 (1947). The board regulates in detail many aspects of federal savings and loan associations' operations. See 12 C.F.R. §§ 500.1 through 571.14, especially §§ 541.1 through 571.14. This fairly pervasive scheme of federal regulation may well indicate that Congress has occupied substantial portions of the field in which federal savings and loan associations operate.

Courts have concluded that the language which directs the board to give primary consideration to the "best practices of local mutual thrift and home-financing institutions"; 12 U.S.C. § 1464(a); contemplates uniform national lending procedures for

federal associations. *Lyons Savings & Loan Assn. v. Federal Home Loan Band Board,* 377 F. Sup. 11, 16 n.5 (N.D. Ill. 1974). The statutes clearly indicate that state legislation may not impinge upon the power of the board to regulate and supervise the lending practices of federal savings and loan associations. *Kaski* v. *First Federal Savings & Loan Assn.,* supra, 138–39. Some provisions of the statute, however, specifically allow state law to apply to federal savings and loan associations.[10]

Courts have applied state law to a variety of controversies involving the external affairs of federal savings and loan associations.[11] Other courts have held, often in opinions using unnecessarily broad language, that under the particular circumstances before them federal law preempts application of state law to federal savings and loan associations.[12]

[10] For example, states may impose nondiscriminatory taxes on federal savings and loan associations. 12 U.S.C. § 1464 (h).

[11] Despite extensive federal regulations of trademarks and tradenames a federal court of appeals applied state law to a federal diversity action in which a federal savings and loan association alleged that the defendant adopted and used a confusingly similar name. *First Southern Federal Savings & Loan Assn.* v. *First Southern Savings & Loan Assn.,* 614 F.2d 71, 74 (5th Cir. 1980).

After the effective date of a specific federal regulation that governed the practice, the Oregon Supreme Court applied state law to a federal savings and loan association in a suit brought on behalf of borrowers claiming entitlement to the income the association, by investing funds the borrowers deposited with it for payment of taxes and insurance premiums on their dwellings, derived prior to the effective date of the federal regulation. *Derenco, Inc.* v. *Benjamin Franklin Federal Savings & Loan Assn.,* 281 Or. 533, 577 P.2d 477, cert. denied, 439 U.S. 1051, 99 S. Ct. 733, 58 L. Ed. 2d 712 (1978).

[12] The United States Court of Appeals for the Ninth Circuit has held that a state may not subject a federal savings and loan association to state procedures providing for monitoring, notice, complaint resolution, and enforcement to ensure compliance with a state law prohibiting discrimination in lending based upon consideration of a borrower's race, color, religion, sex, marital status, national

In addition to the prohibition against conditioning loans upon the selection of a particular attorney,[13] two other board regulations are especially relevant to our inquiry. The first authorizes federal savings and loan associations to retain counsel to represent them in connection with processing and closing loans.[14] The second expressly permits a federal association to pass on to the borrower the cost of the association's legal services.[15] These

origin, ancestry or due to consideration of conditions in the neighborhood or geographic area surrounding the borrower's housing accommodations. *Conference of Federal Savings & Loan Assns.* v. *Stein,* 604 F.2d 1256, 1257 (9th Cir. 1979), aff'd, 445 U.S. 921, 100 S. Ct. 1304, 63 L. Ed. 2d 754 (1980). Accord *Glen Ellyn Savings & Loan Assn.* v. *Tsoumas,* 71 Ill. 2d 493, 377 N.E.2d 1, cert. denied, 439 U.S. 927, 99 S. Ct. 311, 58 L. Ed. 2d 320 (1978).

The Ninth Circuit has also held that federal law preempts the field of prepayments of real estate loans to federally chartered savings and loan associations. *Meyers* v. *Beverly Hills Federal Savings & Loan Assn.,* 499 F.2d 1145 (9th Cir. 1974).

The Second Circuit has held that federal law governs the access of members of a federal savings and loan association to lists of persons eligible to vote at the association's annual meeting. *Murphy* v. *Colonial Federal Savings & Loan Assn.,* 388 F.2d 609, 611–12 (2d Cir. 1967).

The Wisconsin Supreme Court has held that federal law determines the validity of an interest rate escape clause, challenged as unconscionable, vague, and indefinite, when the clause appears in a mortgage note given to a federal savings and loan association. *Kaski* v. *First Federal Savings & Loan Assn.,* 72 Wis. 2d 132, 240 N.W.2d 367 (1976).

[13] See footnote 9, supra.

[14] 12 C.F.R. § 563.17-1 (c) (1) provides that associations must receive in connection with each mortgage loan: "(vii) An opinion signed by such institution's attorney-at-law, a title insurance policy, or other documentary evidence customarily used in the jurisdiction in which such real estate security is located, affirming the quality and validity of such institution's lien on the real estate security for such loan . . . ."

[15] 12 C.F.R. § 563.35 (d) provides: "In connection with a loan on a home (as defined in § 541.10-2 of this chapter) occupied or to be occupied by the borrower, an insured institution or subsidiary thereof may require such borrower to reimburse it for legal services rendered by its attorney, or to directly pay such attorney for such services,

regulations and the scheme in which they exist do not clearly manifest an intent to preclude state regulation of the precise narrow field in which the plaintiff's complaint arises.

We now examine whether litigation of the plaintiff's complaint jeopardizes any congressional goal. The association's authority to retain an attorney necessarily includes the right to select an attorney whose primary concern will be the interests of the association. The authority to pass on to the borrower the cost of legal services implies the right to explain that to the borrower. In fact, the board's regulations expressly require that the attorney's fee be "separately itemized on the loan settlement sheet" that is given to the borrower. 12 C.F.R. § 563.35 (d) (4). Moreover, while the regulations do not expressly require the association to disclose the name of the association's attorney, it is logical that if the association passes on the cost of its attorney, it will advise the borrower of the name of that attorney. But the association may do all that without engaging in the alleged steering practice on which the complaint rests. The regulations make no mention of the specific conduct at issue in this litiga-

only if: (1) Such attorney's fee is limited to legal services, attributable to processing and closing such loan (and not unrelated services performed for the institution or subsidiary by the attorney); (2) Such attorney's fee, if in excess of $100, is supported by a statement provided to the borrower at or prior to settlement which: (i) Describes the legal services being performed, (ii) sets forth the time being spent by such attorney and the hourly rate or other basis for determining such fee, (iii) states that the legal services are being performed on behalf of the insured institution or subsidiary and not on behalf of the borrower, and (iv) states that such services are being paid for by the borrower; (3) Such attorney's fee does not exceed that which is reasonable and commensurate with the legal services being performed; and (4) Such attorney's fee is separately itemized on the loan settlement sheet and identified as a fee to the lender's attorney."

tion. Nor does it appear that federal savings and loan associations uniformly or even generally follow the defendant's challenged pratice.

The plaintiff's action does not seek to interfere in any way with the defendant's choice of an attorney. It seeks to prevent the defendant from making gratuitous suggestions designed to induce borrowers to refuse to deal with certain attorneys. Allowing litigation of this state antitrust claim will not so inhibit the defendant's closing practices as to jeopardize federal objectives.

Because the steering practice alleged in the complaint is not even peripherally relevant to the aims of HOLA, federal law does not preempt the remedy for violations of Connecticut statutes that harmonize with federal antitrust law. *Younger* v. *Jensen,* supra, 409. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware,* supra, 135. Federally chartered institutions doing business in Connecticut should comply with the minimum usages and ethics required of all others, unless, unlike the present case, compliance actually conflicts with federal law, jeopardizes congressional purposes, or Congress or a federal regulatory body unmistakably indicates otherwise. *Derenco, Inc.* v. *Benjamin Franklin Federal Savings & Loan Assn.,* supra, 549.

## III

The trial court's memoranda of decision set forth the following facts. The defendant requires and advises borrowers that it requires them to reimburse it for the cost of legal services which its attorney provides to it.[16] If borrowers pay that cost,

---

[16] In Connecticut, the quality and validity of a lender's lien on real estate are customarily affirmed by a written opinion from the lender's attorney. The defendant does not have house counsel. It

they may select an additional attorney, without any involvement by the defendant, to perform, exclusively for them, a title search and other legal services in connection with the mortgage loan. In 1962, as the number of active real property lawyers grew, the defendant's board of directors decided to establish a committee to review the qualifications of attorneys who expressed interest in representing the defendant in mortgage loan transactions. Four directors who are members of the Connecticut bar constitute the committee. Since 1962, the committee has applied two major guidelines in passing upon an applicant's experience: (1) five years continuous practice in Connecticut, and (2) twenty-five closings within the last twelve months or seventy-five within the last three years.[17] The defendant approves over 90 percent of the attorneys who apply. Some are approved on condition that they provide the defendant with a title insurance policy instead of an attorney's certificate of title.

---

uses a number of attorneys throughout Fairfield and New Haven Counties to represent it in mortgage loan transactions. In the vast majority of transactions, the defendant (unlike other institutions) does not review or pass upon any of the closing papers in advance of the scheduled closing. The defendant may have four or five closings on a given day. The defendant's closings do not take place in its offices, but in its attorney's office. None of its officers or employees attend. The defendant relies solely and exclusively upon its closing counsel to make a title search, to provide it with a certificate of title certifying that the mortgage is a first lien on the property, to ensure that the property will be marketable upon default, and to prepare the mortgage note, deed, tax bill authorization, closing statement and signature card. In many instances, the defendant's attorney must prepare a financing statement creating a lien on personal property, an assignment of rents, an escrow agreement, and documents creating easements appurtenant to the mortgaged property.

[17] On occasion the committee has waived one or the other of the guidelines. For example, the committee approved an attorney who has lectured on real estate law throughout the country and had closed 125 mortgage transactions in his year of practice in Connecticut.

The defendant's board of directors makes the decision to approve or disapprove without consulting attorneys already approved or anyone else who is not a member of the board. Many attorneys whom the defendant initially does not approve reapply and gain approval after they obtain additional real property experience. The defendant recognizes that its self-interest dictates that it have a large number of attorneys on its approved list because a significant percentage of its business results from lawyers engaged in real estate transactions. In 1974, there were 350 attorneys on its approved attorneys' list. In 1975, there were 425.

The defendant circulates its list of approved closing attorneys to all its employees who interview mortgage loan applicants. The defendant instructs its loan interviewers to determine whether prospective borrowers have chosen an attorney to represent them in the mortgage loan transaction and to select the borrower's chosen attorney to represent the defendant, if the attorney is on the approved list.

In the event a borrower does not have counsel or the borrower's counsel is not on the defendant's list of approved closing attorneys, the loan interviewer advises the borrower that the defendant will retain an attorney to represent it in the mortgage loan transaction. When borrowers indicate that they will be represented by an unlisted attorney, the loan interviewer also advises the borrower that the attorney may wish to apply to the defendant for authorization to represent it as well as the borrower. By using the same attorney as the borrower, whenever possible, the defendant attempts to minimize

its borrower's closing cost.[18]   Most borrowers elect to use the same attorney as the defendant.  But on many occasions, including two of the three mortgage loan transactions in which the plaintiff was involved, the defendant and its borrowers have had separate counsel.

Although several attorneys testified that in their opinion the defendant improperly rejected their applications, not a single attorney produced any credible evidence that the defendant's policy regarding approved attorneys was the result of an agreement or understanding between the defendant and the lawyers on its list of approved closing attorneys to keep other attorneys off the list.

The Connecticut Anti-Trust Act; General Statutes §§ 35-24 through 35-45; incorporates, in modified form, and with notable exceptions, various provisions of the federal antitrust laws, especially the Sherman Act.  See *Elida, Inc.* v. *Harmor Realty Corporation,* supra, 226; *Mazzola* v. *Southern New England Telephone Co.,* supra, 347–48; 14 H. R. Proc., Pt. 9, 1971 Sess., p. 4182 (Remarks of Representative David H. Neiditz); Brodigan, "The Connecticut Antitrust Act." 47 Conn. B.J. 12, 16 (1973). Our construction of the Connecticut Anti-Trust Act, is aided by reference to judicial opinions interpreting the federal antitrust statutes. *State* v. *Hossan-Maxwell, Inc.,* 181 Conn. 655, 660, 436 A.2d 284

---

[18] In closing transactions the lender and the borrower are generally both interested in obtaining clear title to the property.  Their interests, however, may sometimes conflict.  For example, an easement may be acceptable to a borrower but not to the lender. The defendant tries to impress attorneys who represent both it and a borrower in a mortgage loan transaction that the attorney's legal obligation is to protect the defendant's interest, and in the event of a conflict to apprise it of all the facts that may adversely affect its interest.

(1980); *Elida, Inc.* v. *Harmor Realty Corporation,* supra, 226; *Mazzola* v. *Southern New England Telephone Co.,* supra, 348.

General Statutes § 35-27 is patterned after § 2 of the Sherman Act, 15 U.S.C. § 2. It enumerates three separate offenses: (1) "contract, combination or conspiracy to monopolize"; (2) "monopolization"; and (3) "attempt to monopolize." The first offense requires a plurality of actors. Brodigan, supra, 21; 16 Von Kalinowski, Business Organizations: Antitrust Laws and Trade Regulations § 8.01 n.5 (1980); Belt, "The Connecticut Anti-Trust Act: A Guide To Interpretation," 54 Conn. B.J. 348, 367 (1980).

Monopolization requires possession and willful acquisition or maintenance of monopoly power. *United States* v. *Grinnell Corporation,* 384 U.S. 563, 570–71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966); *Mid-Texas Communications Systems, Inc.* v. *American Telephone & Telegraph Co.,* 615 F.2d 1372, 1385–86 (5th Cir. 1980). Monopoly power is power to fix or control prices or to exclude or control competition in the relevant market. *United States* v. *Grinnell Corporation,* supra, 571.

Successful proof of an attempt to monopolize encompasses: specific intent to control prices or destroy competition, predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and a dangerous probability of success. *Lorain Journal Co.* v. *United States,* 342 U.S. 143, 153, 72 S. Ct. 181, 96 L. Ed. 162 (1951); *Ernest W. Hahn, Inc.* v. *Codding,* 615 F.2d 830 (9th Cir. 1980); see *Nifty Foods Corporation* v. *Great Atantic & Pacific Tea Co.,* 614 F.2d 832 (2d Cir. 1980); Belt, supra, 366; see also *California Computer Products,*

*Inc.* v. *International Business Machines Corporation,* 613 F.2d 727, 736 (9th Cir. 1979) (in a private antitrust action for treble damages an attempt to monopolize also requires that the conduct result in an injury[19] to the plaintiff). The trial court concluded that the plaintiff failed to establish by a fair preponderance of the evidence that the defendant monopolized or attempted to monopolize the practice of real estate law in the cities or towns in which it does business. On appeal the plaintiff makes no legal argument and points to no evidence which suggests that the trial court erred in reaching this conclusion. "It is not our function to determine whether the evidence could have led the trier of fact to a conclusion other than that actually found. Practice Book § 3060D." *Daly* v. *Buckingham Routh Co.,* 183 Conn. 357, 361, 439 A.2d 370 (1981); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 219–20, 435 A.2d 24 (1980).

Section 35-26 is substantially identical to § 1 of the Sherman Act; 15 U.S.C. § 1; and applies to contracts, combinations, or conspiracies in restraint of trade or commerce. Brodigan, supra, 19. The essence of a violation of § 1 of the Sherman Act is concerted action. Brodigan, supra, 20; Von Kalinowski, supra, § 6.01 [1] and [3]. For its provisions to apply, two or more "persons"[20] must agree to act together. *United States* v. *Wise,* 370 U.S. 405, 82 S. Ct. 1354, 8 L. Ed. 2d 590 (1962); *Ernest W. Hahn,*

---

[19] General Statutes § 35-35 provides: "TREBLE DAMAGES FOR INJURY TO BUSINESS OR PROPERTY. The state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs."

[20] General Statutes § 35-25 defines "Person" as "any individual, proprietorship, corporation, firm, partnership, incorporated and unincorporated association, or any other legal or commercial entity."

*Inc.* v. *Codding,* supra, 844; Report of the Attorney General's National Committee to Study the Antitrust Laws, p. 30 (1955); Brodigan, supra; Von Kalinowski, supra, § 6.01 [1], [2]; Belt, supra, 350.

Section 35-28 has no specific counterpart in the federal antitrust laws. It codifies federal case law concerning certain "per se" violations of the Sherman Act, notably § 1. *Elida, Inc.* v. *Harmor Realty Corporation,* supra, 227; *Brodigan,* supra, 24; Belt, supra, 351. A violation of § 35-28 must emanate from a "contract, combination or conspiracy" and thus requires a plurality of actors. Brodigan, supra, 25. See Belt, supra, 353 n.43.

The facts recited in the memoranda of decision support the trial court's conclusions: (1) that the defendant association did not contract, combine, or conspire to preclude the plaintiff and other attorneys similarly situated from engaging in the practice of real estate law; (2) that the defendant association in the conduct of its business did not contract, combine or conspire with its board of directors or other attorneys on its approved list to monopolize or attempt to monopolize the practice of real estate law in the cities or towns in which it does business; and (3) that the defendant acted unilaterally without contracting, combining or conspiring with the attorneys on its list of approved closing attorneys or with its board of directors in adopting and using its closing practices.[21] These conclusions preclude a judgment that the defendant violated

---

[21] The trial court also concluded that the defendant's use and maintenance of its list of approved closing attorneys was not motivated, in whole or in part, by any desire or intention to harm or damage the plaintiff or any other unlisted attorney or otherwise to accomplish any anticompetitive purpose.

General Statutes §§ 35-26, 35-28, or the "contract, combination or conspiracy" provisions of § 35-27.

The plaintiff seeks to avoid that preclusion by asserting that the trial court ignored certain "facts." In support of that assertion he summarizes the testimony of several witnesses. Much of this testimony repeats facts stated in the memoranda. Moreover the sifting and weighing of evidence is peculiarly within the functions of the trial court. *Swenson* v. *Dittner,* 183 Conn. 289, 293, 439 A.2d 334 (1981). That court is the final judge of witnesses' credibility and the weight, if any, to accord their testimony. Id. The facts set out in the memoranda of decision are supported by the evidence. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra. The plaintiff's wholesale attack on the court's statement of the facts is improper and cannot be sustained on this appeal. See *McLaughlin* v. *Chicken Delight, Inc.* 164 Conn. 317, 319, 321 A.2d 456 (1973).

There is no error.

In this opinion the other judges concurred.